In re Robert S. ROSS, Elizabeth A. Ross, Debtors.

**PAN–WESTERN LIFE INSURANCE CO., Plaintiff,**

v.

**Robert S. ROSS, Elizabeth A. Ross, Defendants.**

Bankruptcy No. 2–87–03309.

Adv. No. 2–87–0290.

United States Bankruptcy Court, S.D. Ohio, E.D.

July 11, 1988.

Bruce L. Ingram, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for plaintiff Pan–Western Life Ins. Co.

Frederick L. Ransier, Ransier & Ransier, Columbus, Ohio, for defendants Robert S. Ross and Elizabeth A. Ross.

OPINION AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

BARBARA J. SELLERS, Bankruptcy Judge.

Pan–Western Life Insurance Co. ("Pan–Western") initiated this adversary proceeding to except a debt from the effect of discharges granted to Robert and Elizabeth Ross in their jointly filed Chapter 7 bankruptcy case pending before this Court. The matter was tried to the Court on May 11, 1988.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

FINDINGS OF FACT

Robert S. Ross ("Ross") was the owner of a small business known as Independent Professional Service Associates, Inc. ("IPSA") which provided word processing services to clients on a contract basis. In 1985 Ross had an opportunity to become an original equipment manufacturer's representative ("OEM") for Digital Equipment Corporation ("DEC") for purposes of selling DEC computer hardware to certain

government and medical customers. Ross sought to form a separate subsidiary corporation of IPSA to pursue that effort. Before DEC would finalize the OEM arrangement, however, the new corporation, IPSA Systems, Inc. ("Systems"), was required to have in place a line of credit and accounts receivable financing.

In his quest for venture capital, Ross contacted Peter Pointer of the investment banking company of Lowe & Associates. Pointer, in turn, introduced Ross to George Manser, chairman of the board of directors of North American National Corporation ("North American") and its subsidiary, Pan–Western. Subsequent to that initial contact and in response to Manser's request for specific information, on July 22, 1985, Pointer sent a letter to Manser setting forth Systems' requirements for capital. With that letter was a business plan which projected sales for Systems, information about certain minority set-aside programs in Ohio, Ross' resume and IPSA's financial statement as of December 31, 1984. The letter also characterized IPSA as a break-even operation.

Manser, Pointer, Ross and Melvin Wilder, Ross' accountant, met in mid-August, 1985. The primary purpose for that meeting was to permit Manser to meet Ross and to hear Ross' business plans before Manser determined the desirability of making a loan to Systems from North American through Pan–Western. Ross and his plans impressed Manser, who believed that Ross, as the force behind Systems, could capitalize on minority set-aside programs if he could take advantage of DEC's offer to be its first minority OEM dealer in the United States. Ross made no secret of his lack of significant assets, but hoped nevertheless to obtain the loan from Pan–Western for Systems.

Subsequent to that meeting, Pointer called Ross and informed him that North American would require a personal financial statement and personal guaranty from Ross and his wife as a condition of any loan to Systems. Ross, in turn, informed Wilder of his need for the financial statement. Wilder prepared the financial statement af-

ter speaking with Ross about certain of his assets and liabilities. Although Wilder did not remember having any role in that preparation, the Court believes he was the preparer. It is the accuracy and effect of that financial statement which is the basis for Pan–Western's challenge to the dischargeability of its obligation.

The Rosses' personal financial statement was supplied to North American in late November, 1985. After further discussions and correspondence with Pointer, North American communicated to Pointer the final terms under which it would extend the loan to Systems. Those terms were accepted by Systems and the Rosses on December 12, 1985.

The loan from North American, through its subsidiary Pan–American, was in the form of a debenture. Pursuant to the debenture agreement dated January 23, 1986, Pan–Western loaned $100,000 to Systems and agreed to a repayment schedule over a term of nine years with payments only of interest during the first four quarters. The agreement restricted Systems' ability to pay cash dividends and set limits on Ross' salary. Certain terms of the loan commitment granted North American a seat on Systems' board of directors and further provided for the issue of stock warrants, exercisable by North American during the term of the loan for 20% of Systems' authorized shares. Lowe & Associates also received 10% of Systems' shares for its part in obtaining the needed capital. Robert and Elizabeth Ross personally guaranteed the loan.

During the time the negotiations with North American were ongoing, Ross also applied for and received commitment for a working capital loan for IPSA from the City of Columbus. That loan, in the amount of $50,000, was closed on November 1, 1985. Robert and Elizabeth Ross also were required to guarantee that loan and to grant a third mortgage against their residence to secure that guaranty.

The personal financial statement presented to North American by the Rosses, which is attached as an appendix, contained a number of inaccuracies. Specifically, the

value of the Rosses' real property was given as $70,000 instead of the $62,000 for which it had been appraised in 1984. In addition, the notes to the statement erroneously indicated that the $70,000 value reflected a 1985 appraisal. The remaining balances on the first two mortgages were understated by some $5,000, and no mention was made of the recently granted third mortgage in favor of the City of Columbus. It is conceded that values originally indicated for AT & T and Medex shares owned by Ross were overstated, but were corrected by Pointer prior to presentation of the statement to North American. In addition, Ross does not own the ten shares of AT & T shown, but owns only two such shares. The value ascribed to Ross' share interest in IPSA was not supported by that company's balance sheet or otherwise. Finally, the contingent obligation of guaranty to the City of Columbus was not revealed.

### THE ISSUE

The issue before the Court is whether the personal financial statement of Elizabeth and Robert Ross, presented to North American and Pan–Western in connection with a loan to Systems personally guaranteed by the Rosses, is a false financial statement which gives rise to a' nondischargeable obligation within the meaning of 11 U.S.C. § 523(a)(2)(B).

### CONCLUSIONS OF LAW

Section 523(a)(2)(B) of the Bankruptcy Code provides for an exception to discharge of an obligation which is:

(2) for money ... or an extension ... of credit, to the extent obtained by—

. . . .

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money ... or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

The standard of proof imposed upon a plaintiff in an action based upon § 523(a)(2)(B) requires Pan–Western to establish its case by clear and convincing evidence. *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir.1985).

### A. *Material Falsity Respecting the Debtors' Financial Condition.*

The Rosses conceded that Pan–Western's evidence demonstrated certain inaccuracies in their financial statement. By testimony, however, Ross attempted to explain those inaccuracies.

Ross indicated that he knew the most recent appraisal of his real property, performed in 1984 rather than 1985 as indicated on the financial statement, gave an opinion of value in the low sixty thousands. He believed that figure had been $65,000 rather than $62,000, but did not verify that belief by reviewing the appraisal. When Wilder questioned him about the value of his residence at the time the statement was being prepared, he "guessed" it would now be worth $70,000. He also stated that if he were to sell the house, he would ask $70,-000 for it. Frankly, considering the inexactness of valuing real property, the Court does not find Ross' representation so overstated as to raise issues of culpable misrepresentation. Given that the basis for the value was identified in the financial statement as the result of a 1985 appraisal, however, both the value and the basis are inaccurate.

The financial statement also understated by approximately $5,000 the balances owing on the first and second mortgages against the real property. Ross' explanation of that inaccuracy was that those amounts were his best guesses of what he and his wife owed. Neither he nor Wilder verified those amounts, however, and records from the mortgage companies indicate that Ross' estimates were not correct. While those understatements are not of great magnitude, when combined with the overstatement of value for the real proper-

ty, the appearance of equity is significantly inflated.

The financial statement further indicated that Ross owned 10 shares of AT & T stock, valued at $23 per share. In fact, Ross owned only two such shares. Apparently he believed he owned 10 shares because that number was also indicated on a previous financial statement submitted to a local bank on its form in 1984. Ross did not examine his share certificates, however, and that belief was incorrect. That inaccuracy accounts for less than $200, however, and is not material or even significant in the context of a guaranty for an obligation of $100,000, other than the perception it reinforces of Ross' lack of care in preparing and presenting a statement of personal worth to a potential lender.

Ross' interest in IPSA was given a value of $37,500. Ross indicated he had no idea of the value of his 100% shareholder position in IPSA, but relied upon Wilder, as an accountant, to produce that information. As IPSA actually had few, if any, assets in excess of its liabilities, that shareholder equity calculation was substantially overstated.

The more serious inaccuracy in the financial statement, however, arises from the failure to show as a liability a third mortgage against the Rosses' real property, granted November 1, 1985 and recorded November 13, 1985, less than two weeks prior to the effective date given for the personal financial statement. That mortgage was granted in connection with the Rosses' personal guaranty of a $50,000 working capital loan to IPSA. Ross and his wife both indicated awareness of their secondary liability for IPSA's obligation as guarantors, but neither believed they had granted yet another mortgage on their real estate to secure that guaranty. Nevertheless, such omission was a misrepresentation. The contingent liability on the note also was not included, but without any indication that contingent liabilities were to be revealed or that IPSA was in default of payments on that obligation, that omission is more understandable.

The Court finds that the omission of the third mortgage, when combined with the other inaccuracies in the statement and when considered in the overall context of the amount of net worth indicated, causes the financial statement to constitute a materially false statement respecting the debtors' financial condition.

B. *Reasonable Reliance by the Creditor.*

The element of reasonableness as a modifier to reliance by a creditor extending credit or making a loan was added to the false financial statement exception to discharge by the Bankruptcy Reform Act of 1978. *See* Bankruptcy Act of 1898, § 17(a)(2), 11 U.S.C. § 35(a)(2), (repealed); H.Rep. No. 595, 95th Cong., 1st Sess. 130 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News at 5787. The primary stated purpose for that additional requirement was to eliminate frequent actions for nondischargeability in consumer cases where the creditor had indicated to the debtor either that the financial statement was only a formality or that its accuracy was not very important. Where a debtor simply followed such instructions with little understanding of the process, it was thought inappropriate to consider resulting omissions as culpable. H.Rep. No. 95–595, 95th Cong., 1st Sess. 130–131, *reprinted in* 1978 U.S.Cong. & Admin.News at 6091.

The reliance element has been construed by the Court of Appeals for the Sixth Circuit in at least two recent cases. In the first of those opinions, the Court indicated that "[T]he reasonableness of reliance isn't rigorous, but is to get at creditors acting in bad faith." *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir.1985). Although the bank extending credit in *Martin* had obtained a credit report, it had not extensively investigated the accuracy of the borrower's representations of assets and liabilities. Under those circumstances, and where the loan was small compared to the net worth indicated by the false financial statement, the Court held that the lender's reliance was reasonable. Where the debtor had intentionally communicated a materially false financial statement upon which the lender partially

relied, the debt would not be discharged. *Martin*, 761 F.2d at 1166–1167.

In a case decided one year later, the Court of Appeals for the Sixth Circuit further considered the element of reliance in an action finally determined under the exception to discharge for fraud under § 523(a)(2)(A), rather than on the false financial statement ground in § 523(a)(2)(B). *Coman v. Phillips (In re Phillips)*, 804 F.2d 930 (6th Cir.1986). In *Phillips* the parties had been friends and church associates for a number of years. Coman's failure to verify the acreage shown on the face of a mortgage deed given by Phillips to secure a loan and Coman's reliance on the representation contained in that deed were not unreasonable under those circumstances. If other elements of fraud are shown, the Court indicated that the creditor's failure to verify assets should not defeat nondischargeability unless such reliance was so unreasonable as not to be reliance at all. The purpose for narrowly construing the reliance element in § 523(a)(2), according to the *Phillips* court, is to protect the discharge only for an honest debtor. Where the debtor is shown to have acted dishonestly, such protection is slight or non-existent. *Phillips*, 804 F.2d at 933. It was not clear how important to the result was the friendship relationship of the parties, but this Court believes that was a pivotal fact which severely limits application of the *Phillips* holding to the matter now before this Court.

In applying the *Martin* and *Phillips* criteria, the Court notes that the Rosses and North American/Pan–Western had no prior relationship. Further, this was a commercial, not a consumer, loan. Pan–Western, through its representative, testified that if the Rosses' financial statement had accurately reflected their financial condition, the loan to Systems would not have been granted. This representation was not successfully challenged by the Rosses and is accepted by the Court. The question before the Court, therefore, is whether Pan–Western's reliance on the financial statement was reasonable under the circumstances.

Frankly, the Court does not believe North American relied primarily upon the Rosses' financial statement in its decision to extend a loan to Systems. After deduction of the two mortgages, even in the amounts shown, and allowance for costs of sale and the $10,000 exemption granted to residents in the state of Ohio against an executing judgment creditor, certainly any equity in the Rosses' real property would have resulted only in insignificant recovery for Pan–Western in the event of a default by Systems. Likewise, Pan–Western should not have relied upon the value given for Ross' interest in IPSA. A company whose business includes the making of venture capital loans certainly realizes the ephemeral quality of any values ascribed to share interests in a small company, and if relying on such value, would take at least minimal steps to verify its accuracy. In addition, previous correspondence to Manser from Pointer had indicated that IPSA was only a break-even operation. Pan–Western also had been furnished a copy of IPSA's 1985 tax return and its balance sheet as of November 30, 1985. On the basis of those documents, Pan–Western could have had no reasonable reliance on any value ascribed to those shares.

Other than the real property and the IPSA share interest, the Rosses had no other assets of even marginal value to an executing creditor. Accordingly, the Court believes Pan–Western's interest in the loan was not dependent upon the net worth indicated by the financial statement except, perhaps, as an indicator that the Rosses were not insolvent or hopelessly in debt.

The Court further believes that the significant motivation for North American/Pan Western was the opportunity it saw to invest in a minority enterprise which appeared to have opportunities to capitalize on set-aside projects and thereby earn a profit for its equity security holders, including North American. The warrant rights granted as part of the debenture agreement and the option to participate as a director of Systems were part of this plan. The loan was necessary to enable the business to begin to operate and both Pan–Western and Ross expected it would

be repaid in due course. But North American's involvement and participation in the company's expected future profits were its goals; its primary reliance was upon Ross' business ability and reputation. In fact, that reputation was verified by contacts with customers of IPSA. The purpose for the guaranty was less to ensure repayment by attachment of the Rosses' non-exempt assets than to act as a motivating force for Ross to use his best efforts in running Systems.

Nevertheless, given the degree of error in the financial statement, by misstatement or omission, and given Pan–Western's need for the financial data to assess the overall picture of Ross' economic reality, the Court finds that Pan–Western relied, in part, upon the thrust of the Rosses' financial statement in deciding to extend the loan to Systems. Despite Pan–Western's failure to take any steps to verify that statement and the unreasonableness of any reliance upon values asserted for the IPSA stock, Pan–Western's partial unverified reliance on the statement as a whole was not unreasonable. That statement was part of the data it needed to assess the correctness of its trust in Ross' ability to manage his own affairs and those of his companies. The Court also finds that North American never gave Ross any indication that he could be less than careful in the presentation of his financial data. Therefore, under the rationale of *Martin* and in what is admittedly a close call, the Court finds that reasonable partial reliance has been established. *Martin*, 761 F.2d at 1163.

### C. *Intent to Deceive.*

The final and pivotal element which Pan–Western must show is the Rosses' intent to deceive through the submission of a materially false financial statement. As a matter of fact, no such intent could be shown with regard to Elizabeth Ross. Indeed she was not involved either in the preparation or presentment of the financial statement and was not aware that any statement of her personal financial condition had been given to Pan–Western. The Court finds further that the evidence failed to establish actual deceitful intent on the part of Ross.

A closer question, however, is whether Ross' financial statement, which has been found to be materially inaccurate and upon which the creditor at least partly relied, was prepared or presented with such inattention to its accuracy as to constitute gross recklessness. Under the law of this circuit, gross recklessness can, in certain circumstances, establish intent to deceive as a matter of law. *Knoxville Teachers Credit Union v. Parkey (In re Parkey)*, 790 F.2d 490 (6th Cir.1986).

Omission of the third mortgage, inflation of the IPSA stock values and the market value of the residence, understatement of the outstanding balances on the first and second mortgages and inclusion of extra AT & T shares caused the Rosses' net worth to be stated as $70,505. As corrected for those errors, and assuming that IPSA would default on its loan, that net worth should have been a negative value of approximately $33,000. The question is whether the number and magnitude of those errors indicate gross recklessness in the preparation and presentment of the financial statement such that intent to deceive must be inferred.

It has been said that if a debtor cannot identify the source for the numbers he represents by a financial statement, he has so recklessly disregarded the truth of his representations that an intention to deceive must be inferred. *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Kimberly (In re Kimberly)*, 13 B.R. 145 (Bankr.S.D.Fla.1981). Likewise, if a debtor sees a financial statement prepared on his own behalf and the errors are such that he should have known of their falsity, an intention to deceive can be inferred. *First Nat'l. Bank of Boston v. Coughlin (In re Coughlin)*, 27 B.R. 632 (Bankr. 1st Cir.1983).

Neither the circumstances in *Kimberly* nor those in *Coughlin* are present in this case. The financial statement was prepared after Ross had discussions with his accountant. While Ross did not know or understand the basis for the value ascribed to his interest in IPSA, he justifiably relied on his accountant to calculate that correct-

ly. In addition, Pan–Western had other documents which should have alerted it to the inaccuracy of that value. Ross' value for his real estate and the balances for the first and second mortgages against that property were his best estimates. He should have verified those amounts. He testified, however, that the value given for the real property is what he would ask were he to try to sell the property. Further, the mortgage balances are not so erroneous that any intent to deceive could be inferred. Therefore, it cannot be said that Ross either gave numbers without knowing or caring about their source or in a manner such that their falsity would have been obvious when he reviewed the statement.

Similarly, the misrepresentation about the number of AT & T shares Ross owned cannot be said to be fraudulent. Ross was mistaken in his belief about his share interests, but there is no indication such misrepresentation was intentional or by design. Unknowing falsity, absent unusually compelling circumstances, will not give rise to a presumption of fraudulent intent. See *First Safety Fund Nat'l. Bank v. Valley (In re Valley)*, 21 B.R. 674, 680 (Bankr.D. Mass.1982).

Actually, it is only the omission of the third mortgage which makes the decision in this case a difficult one. The other omissions or incorrect amounts are not so significant that, even if represented correctly, they should have altered Pan–Western's decision to extend credit to Systems.

The Court finds it difficult to believe that a college graduate with at least several years of experience in running his own business would not realize that he had granted a third mortgage against his home to the City of Columbus only a short time prior to the time he presented his personal financial statement to Pan–Western. Nevertheless, the Court found Ross to be a credible witness and believes he somehow did not realize the third mortgage had been taken to secure his guaranty of IPSA's loan. The reasonableness of Elizabeth Ross' belief is not relevant since the Court has found that she was not involved in the making or presentment of the financial statement. That Ross was not aware of the third mortgage until a later time is supported by the fact that the documents surrounding the City of Columbus loan were hurriedly signed during a lunch hour break for Mrs. Ross. The mortgage also was not reflected in a subsequent 1986 loan application to a local bank to obtain refinancing for the first and second mortgages. Indeed, it was that lender's investigation during the refinancing process which apparently first caused Ross to understand that a third mortgage had been granted and perfected against his residential real property.

Although he should have been aware of all mortgage indebtedness against his property, the Court specifically finds that such awareness did not exist. Indeed, to succeed in the business world, Ross should have had more financial acumen than he demonstrated by his testimony during the trial of this matter. But this Court is not willing to presume intent to deceive from lack of knowledge. Such reluctance may place a higher duty of care upon the recipient of a financial statement than what might be expected in business dealings between a commercial lender and a small business borrower, but that result is not so unacceptable as to compel the Court to infer fraud from unawareness and carelessness.

Ross did not impress this Court as a dishonest debtor. He had few financial assets and did not appear to have pretended to be a person of means. He had hopes of succeeding in his new business venture, but the carelessness of his attempts to verify the representations in his financial statement, if typical of his approach to business generally, may partially explain his failure to succeed through Systems. Neither the evidence, Ross' demeanor nor his statements under oath, however, indicated any intent to deceive. No knowing misrepresentation was shown, and the carelessness did not approach a level which could appropriately be equated with fraudulent intent.

In conclusion, given the clear and convincing standard by which Pan–Western must convince the Court of the correctness of its position and the narrow construction given to exceptions to discharge generally, the Court finds that Pan–Western has failed to meet its burden of proof with regard to the element of intent to deceive. Accordingly, the obligation from Robert and Elizabeth Ross to Pan–Western is dischargeable in the Rosses' Chapter 7 bankruptcy case.

IT IS SO ORDERED.

## APPENDIX

### ROBERT S. AND ELIZABETH A. ROSS
### STATEMENT OF PERSONAL FINANCIAL CONDITION
### AS OF NOVEMBER 22, 1985

#### ASSETS

Current Assets:

| | | |
|---|---|---|
| Cash on Hand and in Bank | $ 700 | |
| Savings Accounts | 5,250 | |
| Personal Property | 14,500 | |
| Real Property | 70,000 | |
| Stocks | 37,800 | |
| Total Assets | | $128,250 |

Liabilities & Net Worth

| | | |
|---|---|---|
| Installment Account | $ 1,995 | |
| Notes Payable to Banks | 5,600 | |
| Notes Payable to Others | 5,870 | |
| Mortgages Payable | 44,280 | |
| Total Liabilities | | $ 57,745 |
| Net Worth | | $ 70,505 |

Notes:
1. Real Estates is single family residence at 3061 Fleet Road, Columbus, Ohio 43232. Joint tenancy; 1985 appraised value.
2. Stocks valuation is as follows:
   10 shares AT & T @ $23.00/sh = $230.00
   10 shares Medex @ $7.00/sh = $70.00
   413 shares IPSA $37,500 (Approximate book value. Market valuation is higher amount)
3. Notes Payable to Banks:
   A. Bank One (student loan)     $5,600.00

4. Notes Payable to Others:

   A. Citizens Federal     $4,000.00
   B. ITT Financial     $1,870.00
5. Mortgages Payable:
   First Mtge to: Yerke Mtge. Co. $22,580 Bal., $318/mo; 25 yr.
   Second Mtge to: TransAmerica Financial $21,700 Bal., $412/mo; 10 yr.