**In re Raymond V. CARTER and Rebecca Lynn Carter, Debtor.**

**SECURITY FEDERAL CREDIT UNION, Plaintiff,**

v.

**Raymond V. CARTER and Rebecca Lynn Carter, Defendants.**

**Bankruptcy No. 86–08294.**
**Adv. No. 87–7530.**

United States Bankruptcy Court,
E.D. Michigan, S.D.,
at Flint.

Oct. 27, 1987.

W. Schuyler Seymour, Flint, Mich., for plaintiff.

Leonard B. Shulman, Flint, Mich., for defendants.

### MEMORANDUM OPINION ON DEFENDANTS' MOTION TO DISMISS AFTER PLAINTIFF'S PROOFS

ARTHUR J. SPECTOR, Bankruptcy Judge.

On March 19, 1987, Security Federal Credit Union filed a suit under 11 U.S.C. § 523(a)(2) requesting the court to determine the defendants' debt to it to be non-dischargeable. The plaintiff alleged that the defendants submitted a false financial statement upon which the credit union relied in granting them a $1,000 advance on May 1, 1986. It claimed that the loan application constituted a false financial statement in that it omitted 11 claims totaling

1. At the time of trial, the plaintiff showed that an additional creditor was also left off, to-wit: Sears Roebuck with a balance of approximately $1,300.00.

$8,508.36.[1] The defendant denied the material allegations and the case was tried. At the close of the plaintiff's proofs, the defendants made a motion pursuant to Bankruptcy Rule 7041, which incorporates F.R.Civ.P. 41(b), for the involuntary dismissal of the case. For the reasons which follow, the Court granted the motion.

Neither the complaint nor the plaintiff's arguments specified whether the cause of action fell within the terms of § 523(a)(2)(A) or § 523(a)(2)(B) of the Bankruptcy Code.[2] Even after the case was tried, it was still unclear under which theory the plaintiff brought this action, so I will assume that the plaintiff relied on both subsections.

On January 22, 1985, Raymond V. Carter, Jr., one of the defendants herein, signed an application for a "Loanliner" credit account with Security Federal Credit Union, the plaintiff herein. The application was completed in the handwriting of a loan officer of the plaintiff and then signed by Mr. Carter. On the top half of the reverse side of the application, the loan officer filled in the names of the various creditors of Mr. Carter which were disclosed to her at the time. Specifically listed were a mortgage to First Fidelity with a $45,000 balance; a car loan from GMAC with a $6,500 balance and a Genesee Bank credit card obligation which Mr. Carter co-signed for his wife with a balance of $5,000.

The plaintiff obtained a credit report from RCB Data Services[3] of Flint which disclosed that Mr. Carter owed debts not only to the three creditors he listed on the application, but also to Ford Motor Credit ($2,945), and Sears Roebuck ($1,351). In addition, the credit report showed that the debtor owed a large balance ($6,329) on a car loan account with Genesee Bank aside from the credit card obligation he disclosed. Notwithstanding the fact that the credit report showed that Carter did not list all of his debts on the application, the line of credit

---

The proofs also showed that, notwithstanding the allegation in the complaint, the debtor owed no debt, as of January 22, 1985, August 14, 1985 or October 23, 1985 (the dates of the credit bureau reports) to Montrose State Bank. The plaintiff had alleged that at the time the $1,000 was advanced to the defendants on May 1, 1986 the defendants owed $1,668.00 to Montrose State Bank. However, no evidence was submitted to prove this allegation.

2. Section 523(a)(2) states as follows:
(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive;

3. An additional ground for dismissal of the case urged by the defendants was that the plaintiff had intentionally failed to provide them with discovery material properly requested by them during the discovery phase of this litigation. Specifically, pursuant to F.R.Civ.P. 34 (applicable in bankruptcy through Bankruptcy Rule 7034), the defendants had requested: "1. that Plaintiff produce and permit Defendants to inspect and to copy the entire loan file applicable to the Defendants for all loans obtained by the Defendants from the Plaintiff at any time and; 2. all credit or financial information relating to the Defendants obtained by the Plaintiff from any source at any time in the possession of the Plaintiff that is not in Defendants (sic) loan file." In response, the plaintiff filed a pleading designated "Plaintiff's Reply to Defendants' Request for Production of Documents" wherein the plaintiff stated that it, "in reply to Defendants' Request for Production of Documents submits the following" and which had various photocopied documents attached. At the trial, defense counsel noted that the plaintiff's only witness was continually referring to a large file. He examined it and noticed that it contained numerous documents which were highly material to the case, which were not included with the plaintiff's tender of photocopies during discovery. The most important of those were the various credit bureau reports referred to in this opinion. As we have dismissed the case on the merits, there is no need to decide whether the failure to provide the defendants with this evidence warrants the sanction of dismissal. However, as the defendants also sought other sanctions, the question of whether such alternative sanctions is appropriate will be set for hearing.

was granted by the plaintiff. Mr. Carter immediately drew $1,200 thereon.

In early August, 1985 Mr. Carter sought an additional advance from the plaintiff. In connection with that application, on August 14, 1985 the plaintiff obtained another credit report. It disclosed a debt to Gantos (a midwest clothing store chain), in addition to those debts listed in the January, 1985 credit report. It also showed that various other credit extenders had inquired within the last month as to Mr. Carter's credit worthiness. These creditors included, among others, Citibank Bankard, Michigan National Bankard, Weichmann Co. (another Michigan clothing store chain), Second National Bank, J.C. Penney, American Express, The Fair Store, and Edwards Men's Shop. This report also indicated a delinquency owing to Genesee Merchants Bank, the bank which financed Mr. Carter's automobile. In point of fact, the car had been repossessed in June, 1985. On August 19, 1985, the plaintiff sent Mr. Carter a form "Statement of Refusal to Grant Loan ..." refusing him the advance on the ground that he "must clear delinq[uent] cr[edit]".

Mr. Carter again sought credit from the plaintiff in late October, 1985. Once again the plaintiff turned him down, setting forth its reasons as "excessive obligations", "credit record" and "inadequate collateral", based upon another credit report. This one disclosed that, in addition to the debts he previously listed and those the credit union had previously learned about through other earlier reports, Mr. Carter had an open revolving charge account at NewCentury Bank (although there may not have been a balance due at that time).

Finally, on May 1, 1986, Mr. Carter, and this time his wife, Rebecca L. Carter, submitted a Loanliner advance request voucher to the plaintiff seeking a new advance on the Loanliner account in the amount of $1,000. The application contains a green shaded area approximately one-third the way down the front side of the page entitled "Changes since last advance", with a space for the listing of all debts. This shaded area was left blank by the defendants.

The plaintiff's only witness at trial indicated that it was standard operating procedure to leave that shaded area blank notwithstanding the form's apparent directive to the contrary, since the credit union's procedure was to have a personal interview with the credit union member at the time the new advance request is made. At that interview the loan officer jots down any changes on the original Loanliner application (in this case the one completed on January 22, 1985) in ink of a different color than the original's. That is what happened in this case. The changes noted on the January 22, 1985 original Loanliner application, which were noted in red ink, added additional debts: to Visa of $1,600 and to Master[card] of $1,000. In addition, the amounts of certain monthly payments were slightly reduced. Mrs. Carter did not sign the January 22, 1985 form—either on January 22, 1985, when it was originally prepared, or when it was changed on or about May 1, 1986. Mr. Carter did not re-sign the form attesting to the truth or completeness of the new information. No new credit report was obtained by the credit union at this time. Instead, the credit union relied on a claimed $7,000 annual profit earned by Mrs. Carter at her day-care center. To verify this fact, the credit union had Mrs. Carter submit a copy of her tax return. The purpose for the advance was to purchase equipment for the day-care center. The plaintiff granted the advance in the amount of $1,000.

Over two years previous to the events involved in this lawsuit, on December 14, 1983, the credit union rejected Mr. Carter's application for a $600 loan for the stated reasons of "excessive obligations" and "all bills not listed". It is obvious that this latter statement means that the credit union refused Mr. Carter credit at that time because his application for credit at that time did not list all of his bills.

Mr. and Mrs. Carter filed a Chapter 7 bankruptcy on October 22, 1986, still owing the credit union the sum of $983.64 on the May 1, 1986 advance.

With respect to § 523(a)(2)(A), even were we to conclude that the defendants, or ei-

ther of them, committed some type of generic fraud upon the plaintiff, the fraud would have pertained solely to "a statement respecting the debtor or an insider's financial condition". Therefore, since the only alleged misrepresentation involved the debtor's or the debtor's spouse's financial condition, the plaintiff can not, as a matter of law, succeed under § 523(a)(2)(A).

■ The other potential cause of action is under § 523(a)(2)(B). Under no circumstances could I hold Mrs. Carter's debt to the plaintiff to be non-dischargeable under § 523(a)(2)(B) since it is clear that she did not make or publish the financial statement in question. The proofs were that Mr. Carter, the credit union member, dictated his list of debts to the loan officer; no mention was made whatever of Mrs. Carter. Indeed, she never signed any application for credit or any financial statement. The only document she did sign was the promissory note of May 1, 1986. Therefore, she clearly is entitled to a judgment in her favor.

As Mr. Carter's answer to the complaint admitted that when he obtained the May 1, 1986 advance he owed money to the 11 creditors listed by the plaintiff in its complaint; and, as the January, 1985 credit report clearly establishes that even at that time he owed several of these undisclosed debts, it is clear that the financial statement was materially inaccurate. However, though the proofs might have been sufficient to sustain a finding that Mr. Carter submitted a false written financial statement to the plaintiff on January 22, 1985 which pertained to the debtor's or an insider's financial condition on that date, the credit union failed to prove by clear and convincing evidence that it actually or reasonably relied on that financial statement when it advanced him funds on May 1, 1986. Furthermore, the plaintiff failed to prove by clear and convincing evidence that Mr. Carter made or published the written

financial statement with the intent to deceive.

I am well aware of the recent opinions of the Sixth Circuit Court of Appeals on the element of reliance by a creditor upon the debtor's false financial statement. In *In re Martin*, 761 F.2d 1163, 1166 (6th Cir.1985) the court stated:

> The reasonableness requirement was intended to incorporate prior case law into the current Bankruptcy Act. As such, it cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith. Congress was, however, concerned that creditors use, when feasible, other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts.

*See also In re Phillips*, 804 F.2d 930 (6th Cir.1986); *Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490 (6th Cir.1986).

■ In this case, each time the plaintiff obtained a credit bureau report on the defendants'[4] credit history, it found that the list of debts it had obtained from Mr. Carter was incomplete and inaccurate. In fact, it had previously refused him credit for that express reason. It is clear to me that the plaintiff relied on Mrs. Carter's demonstrated earning ability and not on the January 22, 1985 (original or as "updated") financial statement of Mr. Carter.

■ Even though the January 22, 1985 financial statement contained Mr. Carter's signed affirmation "that everything you have stated in this application is correct to the best of your knowledge and that the above information is a complete listing of all your debts and obligations", and although the list of debts was in fact incomplete at that time, the plaintiff failed to prove by clear and convincing evidence that Mr. Carter's financial statement was made or published by him either on January 22, 1985 or on or about May 1, 1986[5] with the "intent to deceive" the plaintiff.

---

**4.** The evidence discloses that the plaintiff also obtained credit bureau reports on Mrs. Carter on August 14, 1985 and October 23, 1985. The August credit report discloses three, and the October 1985 report discloses six, delinquent accounts.

**5.** Since the debtor was not requested to sign any document on May 1, 1986 attesting to the continued accuracy and completeness of the January 22, 1985 financial statement, *compare In re Martin*, 761 F.2d 1163 (6th Cir.1985), the events of May 1, 1986 do not truly establish a "making

The gist of the plaintiff's complaint is that when Mr. Carter received the $1,000 advance on May 1, 1986, he owed many more creditors than just those which it found in the January, 1985 credit report. In fact, it claims, he also owed balances to Weichmann's ($520.00), Gantos ($980.00), Highlights for Children ($10.00), Credit Management ($47.00), NewCentury Bank ($403.00), The Fair ($225.00), Beverly's ($220.00), Genesee Radiologists ($11.00) and Edwards ($410.00). It is clear from the filed bankruptcy schedules, of which I take notice, that on May 1, 1986, when Mr. Carter received his $1,000 advance he did indeed owe these additional creditors these additional sums. However, notwithstanding that, I still am not convinced by the plaintiff's proofs that Mr. Carter intentionally deceived the plaintiff.

■ It has been held that grossly reckless indifference to the facts might be the legal equivalent of the intent to deceive, *see In re Martin,* 761 F.2d at 1167. The omission of a great number of debts from a financial statement might be evidence of such reckless indifference. *In re Black,* 787 F.2d 503, 506 (10th Cir.1986); *In re Iverson,* 66 B.R. 219, 225 (Bankr.D.Utah 1986); 3 *Collier on Bankruptcy,* ¶ 523.-09[5][b]. However, such an inference should not arise in the average case.

Although on the surface the facts of *Martin* appear similar to those in this case (in each, the creditor obtained a credit report and the loan in litigation was a subsequent advance on a line of credit which required no new written financial statement), *Martin* is distinguishable. The trial court in *Martin* found that "the financial statement was 'replete with materially false statements'; that the Bank would not have made the loan, had it known the truth; [and] that the Bank's reliance on the financial statement was reasonable." These findings were affirmed on appeal because:

(1) The defendants' June 15, 1982 financial statement listed assets of $247,793, while their March 13, 1983 bankruptcy schedules listed assets of only $24,000.

(2) the financial statement listed their net worth as $105,293, while the bankruptcy schedules showed a $47,000 negative net worth;

(3) the loan was small when compared to the defendants' purported net worth;

(4) the bank's prior business dealings with the defendants led them to believe that they were reliable.

Here, although it is alleged that Mr. Carter's January, 1985 financial statement (either as originally submitted or as updated—neither the complaint, the proofs nor counsel's argument makes clear which) omitted $8,508.36 of his debts, it is clear he did not overstate his assets. The loan was large relative to his apparent net worth. The plaintiff's prior dealings with Mr. Carter, particularly its December, 1983 experience when it denied him credit because he failed to disclose all of his debts, showed that he was not reliable. Moreover, by the time it advanced the $1,000 on May 1, 1986, the plaintiff had in hand many credit reports showing that the Carters had many more debts than they had disclosed. Therefore, the plaintiff did not in fact rely on Mr. Carter's January, 1985 financial statement, either in its original or in its updated form when it advanced the $1,000 to the defendants on May 1, 1986. If it did rely on the financial statement, its reliance was patently unreasonable.

Given that the credit union had previously denied him credit based on information obtained from credit reports, Mr. Carter must have known that any attempt to mislead the credit union as to his outstanding debts was doomed to failure. Therefore, it is also unlikely that he had the "intent to deceive" the plaintiff.

When it drafted the Bankruptcy Reform Act of 1978, which enacted the current Bankruptcy Code, including § 523(a)(2) thereof, Congress was well aware that some members of the consumer credit industry used insidious methods to force repayment of their debts despite their borrowers' bankruptcies. It said:

or publishing" case for purposes of

§ 523(a)(2)(B).

It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating the credit risk, very often the statements are used as a basis for a false financial statement exception to discharge. The forms that the applicant fills out often have too little space for a complete list of debts. Frequently, a loan applicant is instructed by a loan officer to list only a few or only the most important of his debts. Then, at the bottom of the form, the phrase, "I have no other debts" is either printed on the form or the applicant is instructed to write the phrase in his own handwriting. In addition, the form states that the creditor has relied on the statement in granting the loan.

However, the creditor often has other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts. Nevertheless, if the debtor files bankruptcy, creditors with these financial statements are in a position to threaten the debtor with litigation to determine the dischargeability of the debt, based on the false financial statement exception to discharge. Most often, there has been no intent to deceive on the part of the debtor, and, as in so many aspects of the creditor-debtor relationship, the debtor has simply followed the creditor's instructions with little understanding of the consequences of his action.

Creditor practices in this area have been so strong that the Bankruptcy Commission recommended that the false financial statement exception to discharge be eliminated for consumer debts. This bill recognizes, however, that there are actual instances of consumer fraud, and that creditors should be protected from fraudulent debtors. It retains the exception, with small modifications. But it also recognizes that the leverage creditors have over their debtors comes not so much at the stage when the loan application is made, but rather when bankruptcy ensues.

H.R.Rep. No. 595, 95th Cong., 1st Sess., Chapt. 3, pp. 130–131, U.S.Code Cong. & Admin.News 1978 pp. 5787, 6091–6092.[6]

In many cases, an applicant is asked to fill out an application for credit on the spot. He is told to list all of his current debts, often in a space provided which is woefully inadequate to the task. As is often the case, a debtor may truthfully fail to recall every outstanding obligation through any number of reasons. He might focus exclusively on the major debts in his life, (the mortgage and car payment for instance). He might not have given any thought to the question beforehand and so just does not know or remember what debts he owes. Sometimes the stress a debtor undoubtedly experiences from having his finances examined by a stranger, who will render a very personal judgment as to the debtor's worth in life, may cause him to omit some debts by accident. The end result is that instead of having loan applicants take the form home to carefully fill it out, too often the lender has the applicant fill out the form in a matter of minutes, increasing the likelihood of error or oversight. When the errors are discovered, the creditor points to the debtor's signed statement that the information provided is complete and true. Whether intentional or not, such common practices in consumer loan transactions may create errors and thereby give rise to a form of "bankruptcy insurance". As Congress noted, an erroneous loan application can raise an issue of nondischargeability for a careless or forgetful loan applicant who may otherwise lack any fraudulent intent. That is why Congress specifically addressed the practices of loan institutions who create incipient false financial statement cases through encouragement of sloppy, incomplete loan applications procedures.

---

**6.** I am also aware of cases filed here which did not go to trial wherein debtors responded to false financial statement complaints, claiming that loan officers told them "don't worry, you've listed enough," or "just make sure your major debts are included." Such cases were resolved through plaintiffs' dismissals of their cases or settlements.

The Eighth Circuit Court of Appeals recently touched on this very issue in *In re Ophaug*, 827 F.2d 340, 343 (8th Cir.1987). In distinguishing between 11 U.S.C. § 523(a)(2)(A) and § 523(a)(2)(B), the court held that reasonable reliance was an element in the former but not the latter. Supporting the distinction, the court stated, "[b]ecause creditors might induce debtors to falsify financial statements in order to make a debt nondischargeable, Congress explicitly required that nondischargeability under section 523(a)(2)(B) be premised upon a showing of reasonable reliance."

In this case, as foreseen by the legislative history quoted above, the list of debts part of the loan application is quite restrictive. In fact, it provides spaces for only two auto loans, two credit cards, and three boxes called "other" (besides irrelevant boxes such as child support, second mortgage, etc.). The form requires the inclusion of the creditor's name *and address*, yet no address appears on the application for any creditor listed. Indeed, even the names of the creditors are vague at best. For example, "Visa" and "Master" can be debts due to any number of financial institutions that issue these credit cards. The form requires the inclusion of account numbers yet no account numbers are included on the exhibit. I recall and reiterate that the application was completed by the credit union's loan officer herself, yet no real effort to comply with the form's apparent requirements is demonstrated. Certainly, then, despite Mr. Carter's signed affirmance that the information he supplied was "complete", it is apparent to me and it must have been apparent to the plaintiff that that representation was grossly inaccurate and that the lack of completeness was not due to an intent by Mr. Carter to deceive the plaintiff.

This case is well within the norm of cases under § 523(a)(2)(B) seen within this jurisdiction. It is appropriate, in conformance with the evidence adduced by the Bankruptcy Commission, and as found in the House Report, that bankruptcy judges look with a jaundiced eye upon plaintiffs' claims of being deceived by false financial statements when: (a) the proofs indicate that the financial statement is unduly restrictive with respect to size and completion requirements, (b) the loan officer completes the application in his or her own handwriting, giving the loan applicant no time to go home and carefully prepare a list of his debts, but instead requires him to dictate them "off the cuff" in the rush of the application process, or (c) a financial statement purports to require information (like addresses and account numbers, etc.), but the creditor disregards the applicant's failure to provide it, thus leading the borrower to believe that the form's requirements need not be seriously considered. Moreover, if a credit bureau report can be feasibly obtained, the trier of fact may fairly expect that it would be obtained unless good reason exists not to. *See In re Phillips* and *In re Martin*. Finally, when, as here, the credit extender has in fact obtained a credit report, it may not ignore the derogatory credit information derived therefrom and claim that it relied only on the financial statement provided by the debtor. Such activity—sticking one's head in the sand, as it were—smacks of the creditor bad faith discussed in *In re Martin*.

For all of these reasons, the defendants' motion for involuntary dismissal was granted.

Because the lawsuit involved the non-dischargeability of a consumer debt under § 523(a)(2) and since the debt will be considered discharged, the defendants are entitled to their reasonable attorney's fees. 11 U.S.C. § 523(d). The defendants may submit a judgment consistent with this opinion including an amount for their attorney's fees. Should the plaintiff disagree with the amount fixed therein, the judgment should be noticed for settlement pursuant to L.B.R. 120 (E.D.M.).