In re Manuel P. MALDONADO, Debtor.

**Tustin Thrift and Loan Association, Appellant,**

v.

**Manuel P. Maldonado, Appellee.**

BAP No. CC–98–1261–MeBK.
Bankruptcy No. LA 93–80816 AA.
Adversary No. LA 95–01633 AA.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Sept. 23, 1998.

Decided Jan. 13, 1999.

Arnold H. Wuhrman, Tustin, CA, for Tustin Thrift & Loan Association.

Thomas A. Davis, Norwalk, CA, for Manuel P. Maldonado.

Before: MEYERS, BRANDT and KLEIN, Bankruptcy Judges.

### OPINION

MEYERS, Bankruptcy Judge.

## I

Tustin Thrift & Loan Association ("Tustin Thrift") filed a complaint against Manuel P. Maldonado ("Debtor") for a determination that Tustin Thrift's claim was nondischargeable under 11 U.S.C. § 523(a)(2)(B). After a trial, the bankruptcy court ruled in the Debtor's favor, stating that Tustin Thrift had not proven the Debtor's intent to deceive and had not mitigated its damages. Tustin Thrift appeals.

We **VACATE** the judgment and **REMAND.**

## II

### FACTS

The Debtor was the sole shareholder, president and chief executive officer of Western Wristpin Company, Inc. ("Western Wristpin"), which manufactured and supplied wristpins to various automobile manufacturers.

The Sonora Group, Inc. ("Sonora") was in the business of equipment leasing, financing and procurement. The President of Sonora offered to provide the Debtor with some needed cash for his company. The Debtor and Sonora decided to enter into a "sale-lease back" transaction, by which Sonora would purchase from Western Wristpin three industrial machines for $34,199.84 in cash. Lionheart Equipment was to be paid $32,500 as selling agent for Western Wristpin, and Sonora was to be paid $1,699.84 as broker for the transaction. After the purchase, Sonora was to lease back the equipment to Western

Wristpin at the rate of $984 per month for 48 months.

The transaction was entered into by Sonora and the Debtor, on behalf of Western Wristpin, in February 1991. The Debtor personally guaranteed Western Wristpin's obligation under the lease.

The Debtor executed a variety of financial documentation in connection with this transaction, signing the papers as President of Western Wristpin. The Debtor executed, among other things, a lease application and personal financial statement, both containing false statements, and the following documents, all of which were falsified: Statement of Income for Western Wristpin for 1990; Balance Sheet for Western Wristpin as of December 31, 1990; personal and corporate federal income tax returns for 1988 and 1989; and appraisals of the three machines. Examples of the falsities are that the Balance Sheet showed the net worth of Western Wristpin to be $188,780.41, while the actual net worth of the company was negative $43,-689. Also, the lease and appraisal stated that the three machines were made in 1976 and 1978, though they actually were manufactured in 1944 and 1955.

Sonora gave all of these documents to Tustin Thrift, which relied on the documents before deciding to enter into the transaction.

Sonora assigned the lease to Tustin Thrift on the same day the transaction between the Debtor and Sonora was executed. Tustin Thrift financed the transaction, issuing checks to Lionheart Equipment and Sonora.

Within a week of the closing of the transaction, the Debtor received notice that he was to make all the lease payments to Tustin Thrift. Western Wristpin made a number of payments to Tustin Thrift. Its last payment was made on January 28, 1993. Tustin Thrift charged off the obligations of Western Wristpin under the lease on April 30, 1993. At that time, it was owed $29,503.60.

The Debtor filed a Chapter 13 bankruptcy petition on February 12, 1993. The case was converted to Chapter 7 in 1994. Tustin Thrift filed a complaint to have the Debtor's obligation to it declared nondischargeable.

After a trial, the bankruptcy court held that the debt was dischargeable. The court stated that the Debtor did not intend to deceive Tustin Thrift. Further, the court held that Tustin Thrift made virtually no efforts to mitigate its damages. After a judgment of dischargeability was issued, Tustin Thrift filed this appeal.

## III

### STANDARD OF REVIEW

Whether the debtor intended to defraud is a question of fact reviewed for clear error. *In re Candland*, 90 F.3d 1466, 1469 (9th Cir.1996). We consider *de novo* whether the bankruptcy court applied the law correctly. *See In re Bammer*, 131 F.3d 788, 792 (9th Cir.1997)(en banc).

## IV

### DISCUSSION

Bankruptcy Code Section 523(a)(2) provides:

A discharge ... does not discharge an individual debtor from any debt ... to the extent obtained by (B) use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive.

The parties agree that the debt was obtained by the use of materially false written statements regarding the Debtor's financial condition on which Tustin Thrift reasonably relied.

### A. *The Intent to Deceive*

The parties dispute whether the Debtor made the false statements with the intent to deceive. According to the Debtor's testimony, Sonora prepared most of the documents and told him that the false statements were made only to satisfy Sonora's internal auditors. While the Debtor did not deny intending to deceive the auditors, he contended that he had no intention of deceiving Tustin Thrift.

There was conflicting evidence regarding whether the Debtor intended to deceive Tustin Thrift. The Debtor described signing the documents while one of Sonora's employees hurried him along. The Debtor testified that he never noticed Tustin Thrift's name on the documents and did not know the lease would be assigned. On cross-examination, the President of Tustin Thrift admitted that there had been no contact between his company and Western Wristpin before the entry of the lease.

On the other hand, Tustin Thrift elicited testimony from the Debtor showing that he was somewhat sophisticated about business. He had incorporated a business, worked on complex weapons systems for the Army and had worked in private industry sorting out complicated orders, maintaining inventory and dealing with bids from multiple suppliers. He had refinanced a home. Furthermore, Tustin Thrift submitted documentary evidence suggesting that the Debtor should have known that Tustin Thrift was involved in the transaction. The Debtor had signed a document stating that the lease could be assigned without his consent. Two of the documents he signed—a UCC–1 Financing Statement and a letter designating a loss payee for insurance purposes—named Tustin Thrift as a party to the transaction. He made all the monthly payments to Tustin Thrift.

■ The creditor has the burden to establish intent by a preponderance of the evidence under Section 523(a)(2)(B). *In re Wada,* 210 B.R. 572, 575 (9th Cir. BAP 1997). "Since direct proof of intent to deceive is nearly impossible to obtain, it may be inferred from proof of surrounding circumstances." *In re Masegian,* 134 B.R. 402, 406 (E.D.Cal.1991). Given that there is conflicting testimony, we do not find clear error in the bankruptcy court's determination that the Debtor did not intend to defraud Tustin Thrift.

■ Yet, this case also involves legal concepts which we review *de novo.* Section 523(a)(2)(B)(iv) concerns "a statement in writing that the debtor caused to be made or published with intent to deceive." On the face of the statute, there is no requirement that the debtor make the statement with intent to deceive the plaintiff. The Debtor admitted that he intended to deceive Sonora's auditors. The court erred in requiring Tustin Thrift to show that the Debtor intended to deceive Tustin Thrift.

The court recited Comment D of Section 533 of the Restatement (Second) of Torts, regarding representations made to a third party:

It is not enough ... that the maker of the misrepresentation does recognize or should recognize the possibility of the third person to whom he makes it, may repeat it for the purpose of influencing the conduct of another. He must make the misrepresentation with that intent, or must have information that gives him special reason to expect that it will be communicated to others and will influence their conduct.

The Restatement has been called "the most widely accepted distillation of the common law of torts." *Field v. Mans,* 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The bankruptcy court relied on the Restatement in ruling that the Debtor did not make the misrepresentations with the intent to deceive Tustin Thrift.

However, the court apparently did not consider whether the Debtor had information giving him reason to expect that the misrepresentations made to Sonora would be communicated to other lenders such as Tustin Thrift. Comment G of the Restatement provides:

Although the maker of the representation is liable only if it is repeated to a person to whom he intends or has reason to expect to have it repeated, it is not necessary that he have any particular person in mind. It is enough that he intends or has reason to expect to have it repeated to a particular class of persons and that the person relying upon it is one of that class.

"This principle has been recognized in California by a number of cases." *Shapiro v. Sutherland,* 64 Cal.App.4th 1534, 1548, 76 Cal.Rptr.2d 101 (1998)(holding that former home owners could be liable for failure to disclose nuisance problem to relocation ser-

vice, despite lack of contractual privity with purchaser).

Although the Debtor might not have known that Tustin Thrift would immediately take over the lease, his liability to Tustin Thrift would be sufficiently established by a showing that he should have expected that the lease could be assigned to another entity. Arguably, the fact that the Debtor had refinanced his home before indicates that he had reason to expect that the lease from Sonora could be assigned to another lender.

The case of *In re Rodriguez*, 29 B.R. 537 (E.D.N.Y.1983), is very similar to the instant case. In that case, the debtor knowingly signed a false statement submitted to a lessor which immediately assigned the lease to a third party, the plaintiff. The debtor claimed that he knew that the lessor was aware of the false information. The court held that the mere fact that the debtor knew that his statements were false demonstrated his intent. *Id.* at 541. The court called the debtor's allegation that he did not disclose the true facts regarding his financial status because he believed that they were already known to the original lender, "simply illogical." *Id.*

The court in *Matter of Archer*, 55 B.R. 174, 179–80 (M.Ga.1985), held that the requirement of intent under Section 523(a)(2)(B) was satisfied where the debtor allowed a self-interested third party to make representations on the debtor's behalf to the detriment of a disinterested potential lender. This is just what occurred in the instant case. Sonora lied to Tustin Thrift in order to get cash for the Debtor and collect broker's fees.

In *In re Lundy*, 165 B.R. 157 (W.Pa.1994), two credit unions sued the debtor under Section 523(a)(2)(B). The debtor claimed that he did not think the loan application had to be accurate because his father and uncle were presidents of the credit unions. The court held that the debtor was reckless and indifferent and thereby intended to deceive the credit unions. *Id.* at 163.

There are many similar cases. *See, e.g., In re Holwerda*, 29 B.R. 486, 488 (M.Fla. 1983)("It is of no consequence in satisfying the element of intent to deceive that the Defendant did not personally present the

false financial statement to the Plaintiff, nor does it make any difference that he intended to deceive another bank rather than the Plaintiff. It is sufficient under § 523(a)(2)(B)(iv) that the Defendant prepared the statement and knew it was false, and that the creditor learned of the statement indirectly and relied on it.").

The bankruptcy court rejected these cases. It stated that misrepresentations made recklessly do not amount to intentional misstatements under Section 523(a)(2)(B). The court cited *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), which held that a debt arising from reckless or negligent conduct is not willful and malicious under Code Section 523(a)(6). The bankruptcy court acknowledged that *Geiger* was a § 523(a)(6) case, but interpreted it as showing the Supreme Court's emphasis on the plain language of statutes. The court concluded that intent to deceive "is perhaps something more than mere negligence or recklessness."

The Debtor in this case has admitted his intent to deceive. The question at hand is whether he may be held liable to Tustin Thrift for his intentional misrepresentations to Sonora's auditors.

In drafting Section 523(a)(2)(B), Congress was aware of loan institutions which, in order to later claim debts nondischargeable, created incipient false financial statement cases by encouraging sloppy and incomplete loan applications. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess., 130–131 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6091–6092; *In re Carter*, 78 B.R. 811, 816–17 (E.D.Mich.1987). Here, the documents were not merely sloppy and incomplete. They were false. Furthermore, Sonora, the entity which filled out the false documents and urged the Debtor to sign them, was paid its fees upfront. Tustin Thrift reasonably relied on the false statements and was left with an unpaid claim.

■ The basic policy of granting discharge of debts is to give the honest but unfortunate debtor a fresh start. *Bammer, supra*, 131 F.3d at 793. The debtor in the instant case may have been unfortunate, but he was not honest. He admittedly intended to deceive

**740**

at least one party: Sonora's auditors. He signed statements that he admittedly knew were false. The court erred in ruling that the Debtor had to intend to deceive Tustin Thrift in order for the debt to be declared nondischargeable.

### B. *Mitigation of Damages*

The court also held that "the efforts to mitigate damages here, such as they were, were virtually nil." It found that Tustin Thrift made no attempt to sell the equipment. The court stated that this was one of the reasons it was ruling against Tustin Thrift.

█ The court erred in basing its ruling on the failure to mitigate damages. While mitigation of damages impacts the amount of the claim, it does not affect the determination of dischargeability. The determination of dischargeability is separate from the determination of the allowance of a claim. *In re Thrall,* 196 B.R. 959, 966 (Colo.1996). Tustin Thrift's failure to mitigate damages could reduce the amount of the claim allowed, but should not cause an otherwise nondischargeable claim to become dischargeable.

Tustin Thrift also disputes the court's determination that it did not mitigate its damages. We will not decide this issue. On appeal is the judgment finding Tustin Thrift's claim against the Debtor dischargeable. The judgment does not disallow the claim or set the amount of the claim. Therefore, whether Tustin Thrift mitigated its damages is a question outside the scope of the appeal.

### V

### CONCLUSION

On disputed facts concerning the Debtor's knowledge of Tustin Thrift's involvement in the lease, the court held that the Debtor had not intended to deceive Tustin Thrift. There was no clear error in this factual finding.

The court erred in failing to consider whether the Debtor had reason to expect that the misrepresentations would be repeated to an entity such as Tustin Thrift.

We remand the order for the court to make this determination.

Finally, we hold that the court should not have based its finding of dischargeability on Tustin Thrift's failure to mitigate damages. The amount of damages has nothing to do with the determination of dischargeability.

### VACATED AND REMANDED.