In re Randy L. COLLIER, Debtor.

Fifth Third Bank, Plaintiff,

v.

Randy L. Collier, Defendant.

Bankruptcy No. 97–52060.
Adversary No. 97–5184.

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

March 5, 1999.

George R. Hicks, Jr., Weltman, Weinberg & Reis, Co., L.P.A., Cleveland, OH, for Plaintiff.

Betty Groner, Akron, OH, for Debtor/Defendant.

## ORDER DETERMINING DISCHARGEABILITY OF DEBT

MARILYN SHEA–STONUM, Bankruptcy Judge.

This matter is before the Court on the Complaint to Determine Dischargeability of Debt Due filed by Fifth Third Bank (the "Bank") and the Answer to Complaint filed by Randy L. Collier ("Debtor"). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(1). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and (b)(1) and by the Standing Order of Reference entered in this District on July 16, 1984.

## I. FINDINGS OF FACT

Unless otherwise noted, the record evidence is undisputed on the following issues, and thus, the Court finds as follows:

### A. Debtor's Acquisition of Fins, Feathers and Furry Things, Inc.

On April 1, 1995, Debtor purchased the stock of Fins, Feathers and Furry Things, Inc., a retail pet store business ("FF & F"), from Phillip H. Dipane ("Dipane"). [Exhibit 2] Prior to purchasing the FF & F stock, Debtor was a regional sales manager with a dog food manufacturer, Bil Jac. As a regional sales manager for Bil Jac, Debtor called on pet stores, including FF & F, which was one of Debtor's accounts.

In purchasing the stock of FF & F from Dipane, Debtor testified that he made a $40,000 downpayment. Debtor also signed a promissory note in the principal amount of $234,909.37, payable to Dipane (the "Dipane Note"). The Dipane Note provides for 120 consecutive monthly installments of $2,850.10, beginning on May 1, 1985. [Exhibit 2] The Dipane Note is secured by a mortgage encumbering real property which was owned by Debtor and located at 405 Rothrock Road, Copley, Ohio (the "Mortgage"). [Exhibit C, attached to Exhibit 2]

Concurrently with Debtor purchasing the stock of FF & F, FF & F entered into a Part–Time Employment and Non–Competition Agreement with Dipane, pursuant to which FF & F was to pay Dipane $50,968.80 in 120 consecutive monthly installments of $424.74, and $18,252.60 in 60 consecutive monthly installments of $304.21, both beginning on May 1, 1995. [Exhibit 1] To secure FF & F's obligations under the Part–Time Employment and Non–Competition Agreement, FF & F granted Dipane a security interest in the inventory, trade and display fixtures of FF & F, the proceeds and product therefrom and the proceeds of insurance

thereon. [Exhibit 1; Exhibit B, attached to Exhibit 2]

## B. *The Bank's Loan to FF & F*

In August 1996, FF & F borrowed $100,-000 from the Bank (the "Loan"). The Loan was secured by a security interest, second in time, in substantially all the assets of FF & F. [Exhibit 9] Debtor personally guarantied the Loan. [Exhibit 10] The Bank also obtained a guaranty of the Loan from the U.S. Small Business Administration (the "SBA"). [Exhibit 13]

James P. Castrigano, an officer of the Bank, testified that the Bank's procedures required that it exercise due diligence before making the Loan, which involved gathering appropriate information, reviewing the documents thus obtained by the Bank and documenting the Bank's review of those documents. Because the SBA was guaranteeing the Loan, the SBA's loan guidelines, which Mr. Castrigano stated are more stringent that the Bank's guidelines, were applicable, and thus the Bank was required to and did obtain certain tax returns for FF & F (Exhibits 15B, C and D) and Debtor (Exhibit 15A) in order to make the Loan.

## C. *The Loan Officers Involved with the Loan*

Debtor testified that he heard about the possibility of obtaining the Loan from Raymond J. Kline, an employee of the Bank. Mr. Kline worked in a branch of the Bank which was located near FF & F's store in Stow. Debtor testified that Mr. Kline was a customer of FF & F and frequently came into FF & F's Stow store.

Debtor testified that he told Mr. Kline that Debtor had purchased FF & F and that the former owner of FF & F held "paper" arising from the sale. Debtor further testified that Mr. Kline informed Debtor that the Bank was looking for new business and that,

if FF & F wanted a loan, money was available from the SBA. Debtor decided to obtain the Loan for the purpose of opening a third location for FF & F, although he testified that obtaining the Loan was not critical to him. Debtor said that, if FF & F did not get the Loan, FF & F would not have opened a third location.

Although Mr. Kline initiated the loan process with FF & F, two other employees of the Bank completed the process, Rod Vargo and Kenneth Hastings.[1] Mr. Vargo and Mr. Hastings signed the "blue", a document which was reviewed by members of the Bank's loan committee. The "blue" contains a summary of: (a) the terms and intended purpose of the Loan, (b) the collateral for the Loan, (c) Debtor's business background, (d) FF & F's financial performance and (e) FF & F's long term debt. [Exhibit 16] The "blue" mentions the debt related to the Part–Time Employment and Non–Competition Agreement between FF & F and Dipane. However, the "blue" does not discuss *Debtor's* personal finances, such as the Dipane Note or the Mortgage.

In contrast to Mr. Kline, Mr. Vargo and Mr. Hastings, Mr. Castrigano, the only officer of the Bank who testified, did not meet with Debtor or Debtor's accountant before the Bank made the Loan. Rather, Mr. Castrigano was a member of the Bank's loan committee which approved the making of the Loan. As a member of that committee, Mr. Castrigano did not review, among other documents, FF & F or Debtor's tax returns which were provided to the Bank pursuant to SBA guidelines. Instead, Mr. Castrigano testified that he, like other members of the loan committee, reviewed a cover sheet prepared by the Bank, the "blue" (Exhibit 16) and a "fast spread" which is a spread sheet generated by the Bank's software. The "fast spread" summarized four years of FF & F's financial history and Debtor's personal financial statement.[2]

---

1. Mr. Castrigano testified that Mr. Vargo and Mr. Hastings are no longer employed with the Bank. Mr. Castrigano obliquely stated that these loan officers were formerly employees of a savings and loan institution and that the Bank conducts business "significantly differently" from a savings and loan.

2. Neither the Bank nor Debtor submitted the "fast spread" reviewed by the Bank's loan committee as an exhibit.

### D. Debtor's Personal Financial Statement

In connection with FF & F obtaining the Loan, Debtor provided a personal financial statement, dated May 8, 1996, to the Bank. Debtor's financial statement does not disclose the existence of the Dipane Note[3] or the Mortgage. [Exhibit 4]

Debtor filled out his personal financial statement during a meeting with Mr. Kline. Debtor testified that he told Mr. Kline that Debtor did not know how to fill out the financial statement and that he asked Mr. Kline for advice on what Debtor should list for each item provided in the statement. Debtor further testified that most of the financial statement was filled out while he was in the meeting with Mr. Kline and that some of the information provided on the financial statement was written by someone else. At trial, Debtor did not remember whether or not he took the financial statement home with him.

Although Debtor provided the Bank with his incomplete personal financial statement, Debtor testified that Debtor's accountant, Ken Cohart, provided the Bank with most of the financial information required to obtain the Loan, including the December 31, 1995 financial statement of FF & F (Exhibit 14C), the 1993, 1994 and 1995 tax returns of FF & F (Exhibits 15B, 15C and 15D) and Debtor's 1995 tax return (Exhibit 15A). Mr. Castrigano confirmed that the Bank obtained these documents.

Debtor said that Mr. Cohart had copies of all the documents related to Debtor's purchase of FF & F and that Debtor told Mr. Cohart to provide the Bank with the financial information and documents required to obtain the Loan. Debtor believed that Mr. Cohart provided the Dipane Note and the Mortgage to the Bank.

Mr. Castrigano testified that a copy of the Dipane Note was not part of the Bank's file for the Loan and that to his knowledge the Dipane Note was not disclosed to anyone at the Bank. Furthermore, Mr. Castrigano testified that the Dipane Note should have been,

and is not, reflected in FF & F's December 31, 1995 financial statement and in FF & F's 1995 tax return. Debtor testified that he does not know how to prepare a corporate financial statement or a corporate tax return and did not know whether or not FF & F's December 31, 1995 financial statement or FF & F's 1995 tax return properly reflect the Dipane Note.

Although the tax returns of FF & F might not reflect the existence of the Dipane Note, Debtor's personal tax return for 1995, which the Bank obtained pursuant to SBA guidelines in connection with making the Loan, states that Debtor had investment interest expense of $12,285 in 1995. [last page of Exhibit 15A, being form 4952] Such investment interest expense is far in excess of that which would have been incurred from the indebtedness which was reflected in Debtor's personal financial statement, i.e., $20,000 in "personal debt" and is consistent with the amount of interest due on the Dipane Note. [Exhibit 4]

### E. Debtor's Financial Experience and Acumen

Debtor has a high school education. Other than reviewing sales figures, Debtor did not have financial experience in any job which he held before acquiring FF & F. Debtor used an accountant to prepare his personal tax returns and to prepare the corporate financial statements and tax returns for FF & F.

Debtor testified that, prior to arriving at a meeting to complete his purchase of FF & F (by acquiring FF & F stock), Debtor did not review the documents required to effectuate the purchase. Dipane and Dipane's counsel were present at that meeting. Debtor stated that he was rushed in his review of the documents at that meeting, and although he could have had the assistance of an attorney or an accountant regarding his purchase of Dipane's FF & F stock, he did not obtain such assistance. Rather, he looked to Dipane's counsel.

---

**3.** Debtor testified that by June 1996, after the date of Debtor's personal financial statement but before FF & F obtained the Loan, Debtor had paid down the Dipane Note by approximately $70,000, excluding Debtor's downpayment.

Debtor testified that he did not know the price he paid for FF & F. For example, Debtor believed that his $40,000 downpayment should have been subtracted from the principal amount of the Dipane Note. Debtor said that it was only during the course of his bankruptcy case that he learned of the discrepancy between the price Debtor thought he was to pay for FF & F and the price Debtor became contractually obligated to pay.

After Debtor acquired FF & F, Debtor did not deal with many of the financial aspects of running FF & F. Debtor managed FF & F's employees, signed the majority of FF & F's checks and monitored FF & F's daily sales figures. FF & F's former owner, and Debtor's largest creditor, Dipane, continued to handle FF & F's books and payroll. After Dipane left FF & F's employ, Debtor still did not handle those financial aspects of FF & F's operations but left them to another employee of FF & F. On July 23, 1997, Debtor filed a chapter 7 bankruptcy petition, the most significant cause of which Debtor has attributed to financial pressure exerted by Dipane.

## II CONCLUSIONS OF LAW

### A. *The Provisions of Section 523(a)(2)(B).*

Section 523(a)(2) provides in pertinent part that a discharge may not be granted with respect to a debt for money to the extent obtained by:

  (B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). The plaintiff bears the burden of proof for each of the elements of the nondischargeability provision. *In re Sahadi,* 49 B.R. 954, 956 (Bankr.N.D.Ohio 1985) (holding that creditor did not satisfy requirements of § 523(a)(2)(B) when creditor did not reasonably rely on debtor's inaccurate financial statement). The standard of proof for the exception to dischargeability set forth in § 523(a)(2)(B) is the preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 281, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). Exceptions to discharge are to be strictly construed against the creditor. *Rembert v. AT&T Universal Card Services (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

### B. *The Existence of a Writing*

  Pursuant to § 523(a)(2)(B), the debt at issue must be obtained by use of a statement in writing. In order to make the Loan, the Bank required Debtor to provide the Bank with his personal financial statement and his personal guaranty. Debtor's personal financial statement constitutes a statement in writing.

### C. *Material Falsity Respecting Debtor's Financial Condition*

  For a financial statement to qualify as being "materially false," it must be "one which paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of a type which would normally affect the decision to grant credit." *John Deere Co. v. Iverson (In re Iverson),* 66 B.R. 219, 224 (Bankr.D.Utah 1986). "The information must not only be substantially inaccurate, but also must be information which affected the creditor's decisionmaking process." *Heinold Commodities & Securities, Inc. v. Hunt (In re Hunt),* 30 B.R. 425, 440 (M.D.Tenn.1983). The omission, concealment or understatement of liabilities can constitute a materially false statement. *AmSouth Financial Corp. v. Warner (In re Warner),* 169 B.R. 155, 159 (Bankr.W.D.Tenn.1994) (holding that debtor's omission from his personal financial statement of aggregate liabilities of approximately $1,000,000, which omission resulted in stated net worth of approximately $2,597,000, constituted materially false statement for guarantor of $450,000 loan). *See also Pan–Western Life Ins. Co. v. Ross (In re Ross),* 88 B.R. 805, 808 (holding that debtor's omission from his personal financial statement of any reference to a third mortgage which secured

a $50,000 contingent liability constituted a materially false statement for debtor as guarantor of $100,000 loan).

■ Debtor's personal liability to Dipane, constituting a debt of approximately $165,000 as of June 1996, was omitted from Debtor's personal financial statement. Consequently, if this debt had been disclosed, Debtor's stated net worth of $320,500 would have been reduced by over 50%. Such an overstatement of Debtor's net worth constitutes a materially false statement regarding Debtor's financial condition.

### D. *Reasonable Reliance*

■ In this case, the Bank seeks to deny the discharge of Debtor's obligation on the guaranty of a business debt because of Debtor's alleged failure to disclose his liability on a note secured by a recorded mortgage. The writing on which the Bank focuses is a financial statement which Debtor prepared in a conference with, and with the assistance of, a loan officer who solicited the making of the Loan. Debtor disclosed the interest payments on the secured obligation at issue in his 1995 tax return which he provided to the Bank. This raises questions about the reasonableness of the Bank's reliance on Debtor's personal financial statement.

■ In *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir.1992), *cert. denied* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993), the Sixth Circuit Court of Appeals explained the analysis to be applied when assessing the reasonableness of a creditor's reliance on a financial statement:

> Whether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances. Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; *(4) whether there were any "red flags" that would have*

> *alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.*

*See also Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166–67 (holding that creditor's due diligence was sufficient to establish that creditor reasonably relied on debtors' financial statement when creditor's $2500 loan was small when compared to debtors' purported net worth of $100,000, creditor had prior business dealings with debtors, leading creditor to believe them reliable, and creditor obtained a credit report). As concerns the existence of a "red flag", "[a] lender cannot claim reasonable reliance on a financial statement that the lender knows is inaccurate or incomplete—*particularly where the lender has information in its own files that confirms the inaccuracies or shows the need for further investigation or confrontation with its customer."* *In re Hunt*, 30 B.R. at 450 (emphasis added) (holding that creditor did not reasonably rely on debtor's financial statement when creditor's investigation revealed that debtor had not disclosed all his debts and that debtor did not own some of the assets listed in his financial statement). *See also IFG Leasing Co. v. Vavra (In re Harms)*, 53 B.R. 134, 143 (Bankr.D.Minn.1985) (holding that creditor did not reasonably rely on debtor's financial statement when creditor obtained a Dun & Bradstreet report during its credit investigation which indicated that the values of certain real estate assets listed in debtor's financial statement were inflated); *Whitney National Bank v. Delano (In re Delano)*, 50 B.R. 613, 618 (Bankr.D.Mass.1985) (holding that creditor did not reasonably rely on debtor's financial statement when debtor's accountant provided creditor with explanatory letter stating that omissions in the financial statement might affect the user's conclusions); *Bryn Mawr Trust v. Klein (In re Klein)*, 20 B.R. 119, 122 (Bankr.E.D.Pa.1982) (holding that creditor did not reasonably rely on debtors' credit applications for last two of 38 loans made by creditor when creditor had in its files earlier credit applications which indicat-

ed that debtors' last two credit applications were incomplete).

Consideration of Debtor's challenged personal financial statement in conjunction with Debtor's personal tax return should have led to further inquiry by the Bank. The record is silent on what, if any, scrutiny the Bank gave to Debtor's personal tax return. The most cursory review of the relevant part of that tax return, the report of investment interest expense deduction, would have prompted further inquiry. The Bank's apparent failure to complete the SBA required diligence, that is reviewing Debtor's personal tax return, bears examination in light of the legislative history of the statute on which the Bank relies.

■ The House Report on the Bankruptcy Reform Act of 1978, which enacted the current version of § 523(a)(2)(B), explains Congress' rationale for the reasonable reliance requirement, *i.e.*, preventing creditors from inappropriate use of a borrower's financial statement:

> It is a frequent practice for consumer finance companies to take a list from each loan applicant of other loans or debts that the applicant has outstanding. While the consumer finance companies use these statements in evaluating credit risk, very often the statements are used as a basis for a false financial statement exception to discharge.
>
> ******
>
> However, the creditor often has other sources of information, such as credit bureau reports, to verify the accuracy of the list of debts. Nevertheless, if the debtor files bankruptcy, creditors with these financial statements are in a position to threaten the debtor with litigation to determine the dischargeability of the debt, based on the false financial statement exception to discharge.

H.R.Rep. No. 595, 95th Cong., 1st Sess., pp. 130–31, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6091–92. Because the reasonable reliance requirement was intended to discourage the practice of obtaining a financial statement merely for the purpose of creating an exception to a debtor's right to a discharge, courts have held that a debt may be discharged despite the presentation of an inaccurate financial statement if a creditor disregarded the likelihood that the financial statement was inaccurate.

In *Security Federal Credit Union v. Carter (In re Carter)*, 78 B.R. 811 (Bankr. E.D.Mich.1987), the debtor applied for a loan from the plaintiff-creditor four times. Each time, a loan officer completed the loan application, and the debtor signed an affirmation that the financial statement contained a complete listing of his debts. For each of the first three applications, the creditor obtained a credit report which indicated that the debtor did not fully disclose his debts on the financial statement, resulting in the creditor denying the second and third loan applications. For the fourth application, which the creditor granted, the creditor did not obtain a credit report. Because the creditor in *Carter* appeared to encourage a sloppy, incomplete loan application, had disregarded the information the creditor obtained in earlier credit reports and did not obtain a credit report at the time of the fourth application, the court held that the creditor's reliance on the financial statement, if the creditor had done so, was "patently unreasonable". *Id.* at 816.

■ Although Debtor, as a guarantor, had only contingent liability for the Loan, the rationale for evaluating whether or not the Bank "reasonably" relied on Debtor's personal financial statement is not eliminated. By requiring an individual to guarantee a corporate debt, a tender creates incentive for that individual, such as Debtor, to direct the corporate borrower's resources to the payment of the personally guarantied debt. That incentive is heightened if the lender can threaten the individual guarantor with a nondischargeability action on the guaranty obligation, because the individual provided the lender with an incomplete or inaccurate personal financial statement. Therefore, as in the case of a direct loan to an individual, a lender could benefit when it allows a murky situation involving an individual guarantor to be unresolved. In order to eliminate the incentive for such conduct, similar to the conduct of consumer finance companies

which was specifically discussed in the House Report regarding § 523(a)(2)(B), the reasonableness of a lender's reliance on the financial statement of a guarantor should be subject to the same examination as would occur if the lender loaned money to an individual directly.

With respect to the case at hand, the Bank does not appear to have reasonably relied on Debtor's personal financial statement. Debtor, a palpably unsophisticated guarantor, testified that the information which Debtor wrote in his personal financial statement was provided by Debtor during a meeting with Mr. Kline, who solicited the Loan and advised Debtor on how to fill out the statement. Debtor directed the loan officers to an accountant who was instructed to provide the Bank with whatsoever it needed. The Bank did not present any testimony by Mr. Kline, the loan officer who obtained the financial statement from Debtor, or by the loan officers who met with Debtor's accountant and prepared the "blue", thus leaving undisputed Debtor's account that Debtor provided the Bank, through his accountant, with a copy of the Dipane Note and the Mortgage. Lastly, the SBA's loan guidelines, to which the Bank was required to adhere, required that the Bank obtain *and review* Debtor's personal tax return, which reflects that Debtor had much higher indebtedness than was disclosed in his personal financial statement. Consequently, Debtor's 1995 tax return appears to constitute a "red flag" which should have put the Bank on notice that Debtor's personal financial statement was incomplete.

In light of Debtor's financial inexperience, the method the Bank used to obtain the information included in Debtor's personal financial statement and the Bank's disregard of critical information contained in Debtor's 1995 tax return, the Bank's conduct suggests that the Bank did not rely on Debtor's personal financial statement in good faith. Furthermore, the Bank did not prove that Debtor's accountant did not provide the Bank's loan officers (who are no longer employed with the Bank) with copies of the Dipane Note and the Mortgage. Based on the Bank's conduct and the Bank's failure to meet its burden of proof, the Court finds that the Bank did not reasonably rely on Debtor's personal financial statement when making the Loan.

### E. *Intent to Deceive*

Direct proof of a debtor's intent to deceive is not required for a debt to be nondischargeable under § 523(a)(2)(B). Rather, intent to deceive can be inferred from the surrounding circumstances. *FDIC v. Reisman (In re Reisman)*, 149 B.R. 31, 37–38 (Bankr.S.D.N.Y.1993). However, if there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor. *Van Wert Nat'l Bank v. Druckemiller (In re Druckemiller)*, 177 B.R. 859, 861 (Bankr. N.D.Ohio 1994); *Roster Corp. v. Fisackerly (In re Fisackerly)*, 114 B.R. 145, 151 (Bankr. W.D.Tenn.1990) ("Doubts concerning a dischargeability determination must be construed in favor of the debtor").

For example, in *Druckemiller*, the debtors approached a loan officer ("Mr. Belt"), whom they knew on a previous lender/customer basis and as a friend, to obtain a $1,000 loan. Mr. Belt suggested that rather than taking out a $1,000 loan, the debtors would be better off refinancing all their loans with the plaintiff. On June 4, 1993, the debtors entered into such a consolidation agreement, resulting in a total loan amount of $17,556.21. Payments were to begin on July 19, 1993. The debtors never made a payment on the consolidation loan. On September 2, 1993, the debtors filed a chapter 7 petition.

The court observed that the plaintiff offered no evidence that the debtors never intended to repay the loan or that the debtors were financially insolvent when they signed the loan. The court further noted:

> The Debtors were seeking a relatively small amount of money, not a consolidation of all their debts. If the Debtors had gone to the bank for the purpose of combining all their loans, it may be conceivable that the Debtors had an ulterior motive. However, the option to consolidate was raised by Mr. Belt, not the Debtors. Because the Debtors had consistently made payments on their prior loans, there is no reason to

believe that they did not intend to pay the consolidated loan.

*Druckemiller,* 177 B.R. at 861.

In *Ross,* the court also determined that, despite the submission of a materially false personal financial statement, a debtor lacked intent to deceive. The debtor sought a $100,000 loan to be made to his newly formed corporation. In order to make that loan, the lender required a personal financial statement and a personal guaranty from the debtor. The debtor's personal financial statement, which the debtor prepared with the assistance of his accountant, contained a number of inaccuracies, including its omission of a third mortgage against the debtor's real property. The mortgage secured the debtor's personal guaranty of a $50,000 loan to another small corporation owned by the debtor. The debtor granted the omitted third mortgage less than two weeks prior to the effective date given for his personal financial statement.

In holding that the debtor ("Ross") lacked intent to deceive, the *Ross* court noted the following:

The Court finds it difficult to believe that a college graduate with at least several years of experience in running his own business would not realize that he had granted a third mortgage against his home ... only a short time prior to the time he presented his personal financial statement to [the lender]. Nevertheless, the Court found Ross to be a credible witness and believes he somehow did not realize the third mortgage had been taken to secure his guaranty.... That Ross was not aware of the third mortgage until a later time is supported by the fact that the documents surrounding the [$50,000] loan were hurriedly signed....

Although he should have been aware of all mortgage indebtedness against his property, the Court specifically finds that such awareness did not exist....

Ross did not impress this Court as a dishonest debtor. He had few financial assets and did not appear to have pretended to be a person with means. He had hopes of succeeding in his new business venture, but the carelessness of the attempts to verify the representations in his financial statement, if typical of his approach to business generally, may partially explain his failure to succeed through [that venture]. Neither the evidence, Ross' demeanor nor his statements under oath, however, indicated any intent to deceive.

Many of the facts present in *Druckemiller* and *Ross* are present in this case and also indicate to this Court that the Debtor did not intend to deceive the Bank when he omitted the Dipane Note and the Mortgage from his personal financial statement. As did the loan officer in *Druckemiller,* Mr. Kline, and not the Debtor, provided the impetus for the Loan. Debtor testified that he did not feel any pressing need for the Loan and simply would have deferred, if not foregone, the opening of a third store for FF & F if FF & F could not get the Loan.

Debtor also appears to this Court to be like the debtor in *Ross* (although less educated than the *Ross* debtor). Debtor did not obtain the assistance of an accountant or a lawyer in purchasing the stock of FF & F from Dipane. Like the mortgage at issue in *Ross,* the sale documents underlying Debtor's purchase of Dipane's interest in FF & F were hurriedly signed. Debtor testified that he did not understand the nature of the security which he granted to Dipane to secure the Dipane Note and that Debtor did not even understand that the Dipane Note was his personal obligation, rather than an obligation of FF & F.

In light of Debtor's limited education, his minimal financial experience and his apparent financial naivetè, *e.g.,* leaving Dipane in charge of the books and payroll of FF & F even after Debtor purchased the business, the Court finds it credible that Debtor did not understand his personal liability to Dipane or even know that Debtor had granted Dipane a mortgage against Debtor's real property. Even if Debtor was aware of his personal liability under the Dipane Note, it appeared to this Court that Debtor did not understand that FF & F might not get the Loan if Debtor had fully disclosed his personal liability to Dipane in his personal financial statement. Consequently, the Bank has

failed to establish that Debtor had any motivation to mislead the Bank about his finances.[4]

Lastly, Debtor explained that he provided the documentation concerning his purchase of FF & F to his accountant and thought that his accountant provided the Bank with the Dipane Note and the Mortgage. Based on the Bank's failure to contradict Debtor's testimony by presenting the testimony of the loan officers who met with Debtor's accountant, as well as Mr. Castrigano's suggestion that the performance of these loan officers, in general, might not have satisfied the standards for loan officers of the Bank, this Court is not convinced that Mr. Vargo and Mr. Hastings did not obtain copies of the Dipane Note and/or the Mortgage from Debtor's accountant.[5] In any event, the Bank has not met its burden of proving by a preponderance of the evidence that Debtor intended to deceive the Bank when he omitted his personal liability to Dipane from his personal financial statement.

Because the Court finds that the Bank has not proven that it reasonably relied on Debtor's personal financial statement when it made the Loan or that Debtor intended to deceive the Bank when he omitted his personal liability to Dipane from his personal financial statement, the Court holds that Debtor's indebtedness to the Bank is dischargeable.

IT IS SO ORDERED.

---

4. This absence of motivation is further supported by the information included in Debtor's 1995 tax return, provided to the Bank, which indicates that Debtor paid $12,285 in investment interest expense during 1995. [Exhibit 15A] Debtor had no incentive to omit his liability under the Dipane Note from his financial statement if he thought the Bank would learn of that liability by reviewing Debtor's 1995 tax return. *See, e.g., Carter,* 78 B.R. at 817 (holding that debtor lacked intent to deceive when he failed to disclose certain indebtedness in his loan application because "given that the [creditor] had previously denied

him credit based on information obtained from credit reports, [the debtor] must have known that any attempt to mislead the credit union as to his outstanding debts was doomed to failure").

5. The fact that the blue does not reference the Dipane Note and the Mortgage is not determinative of the matter, because the "blue" appears to be concerned with FF & F's financial posture and not with the assets of Debtor, as a guarantor of the Loan.