**In re Suhas S. KAKDE, Debtor.**

**Buckeye Retirement Co., LLC, Ltd., Plaintiff.**

**v.**

**Suhas S. Kakde, Defendant.**

**Bankruptcy No. 05–33193.**

**Adversary No. 05–3296.**

United States Bankruptcy Court, S.D. Ohio, Western Division at Dayton.

Feb. 8, 2008.

James C. Carpenter, Vincent I. Holzhall, Carpenter Lane, LLC, Justin W. Ristau, Bricker & Eckler LLP, Columbus, OH, for Plaintiff.

John Paul Rieser, Patricia J Friesinger, Rieser & Associates LLC, Dayton, OH, for Defendant.

## DECISION DETERMINING DEBT TO BE DISCHARGEABLE

LAWRENCE S. WALTER, Bankruptcy Judge.

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and the standing General Order of Reference in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

This matter is before the court on the Complaint Objecting to Dischargeability of Debt and Seeking Denial of Debtor's Discharge filed by Plaintiff Buckeye Retirement Co., L.L.C., Ltd. ("Buckeye") [Adv. Doc. 1] and the Answer filed by Defendant Suhas S. Kakde ("Mr. Kakde") [Adv. Doc. 6]. Having abandoned its numerous counts pertaining to denial of discharge under 11 U.S.C. § 727(a), Buckeye proceeded on two nondischargeability counts pursuant to 11 U.S.C. § 523(a)(2)(B) and (4) seeking to deny discharge of the debt owed by Mr. Kakde to Buckeye as assignee of Provident Bank ("Provident"). Buckeye essentially alleges that Mr. Kakde facilitated loan advances to his corporation, U.S. Aeroteam, Inc. ("USAT"), by intentionally or recklessly submitting to Provident certain false and misleading borrowing base certificates. Based on roughly the same facts, Buckeye alleges that Mr. Kakde breached his fiduciary duty to creditors of USAT.

Following a rancorous pretrial period characterized by an inordinate number of contested issues and discovery disputes, the matter finally proceeded to trial on June 27, 2007. The court has carefully considered and weighed the testimony of the witnesses, the exhibits admitted into evidence, and the post-trial briefs submitted by the parties. The following decision constitutes the court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## FINDINGS OF FACT

Mr. Kakde was the president, chief executive officer, and majority shareholder of USAT. On or about November 2, 2000, USAT and Provident entered into an asset-based secured revolving loan transaction ("Loan") with a credit limit of the lesser of $2,500,000.00 or a variable borrowing base amount derived from a formula of 50% of eligible inventory and 85% of

eligible accounts receivable ("Borrowing Base"). Provident's Loan was secured by USAT's inventory and receivables, a security interest having first priority by virtue of a subordination agreement with UPS Capital Business Credit fka First International Bank which otherwise held a first priority security interest in substantially all of USAT's assets. Mr. Kakde executed a guarantee of USAT's obligations under the Loan.[1]

In accordance with the Loan requirements, USAT periodically presented financial statements and collateral reports to Provident. Detailed receivables reports known as Borrowing Base Certificates were generally prepared and faxed to Provident each day ("Borrowing Base Certificates").[2] These Borrowing Base Certificates were prepared by USAT's accounting staff and were usually signed by John Busch ("Mr. Busch"), the chief financial officer for USAT, or by his assistant. Mr. Kakde, as president and CEO, was generally cognizant of financial matters affecting USAT, but he left all of the details to Mr. Busch in whom he had complete confidence. However, on at least one occasion, Mr. Kakde did sign a Borrowing Base Certificate.[3] Provident made periodic advances to USAT under the Loan, with maximum amounts adjusted in accordance with the Borrowing Base.

By early January of 2002, USAT was in default on its Loan with Provident and was consistently in default under various Loan covenants thereafter. In May of 2002, the Loan was transferred to the Special Assets Department of Provident, the department specializing in close monitoring of defaulted or troubled loans. USAT's pattern of profitability and cash flow during 2002 and 2003 was irregular and during that period Mr. Kakde made a concerted effort to accommodate Provident's concerns and to maintain the viability of the company. Among other things, he subordinated his capital contributions, liquidated and contributed his retirement account to USAT, induced a close friend to pledge $455,000 as additional collateral, acquiesced to management and workout consultants suggested by Provident, and worked diligently to find alternative financing to pay off Provident.[4] Reciprocally, Provident did not accelerate the Loan and continued to fund the credit line, sometimes approving payment of specific checks despite an "out of formula" [5] situation.

Originally, USAT had been exclusively a manufacturer for the aerospace industry, a business that had been negatively impacted by the terrorist incidents of Sep-

---

1. Mr. Kakde guaranteed substantially all of USAT's borrowings in the aggregate amount of approximately $10,000,000.00.

2. In addition to the daily Borrowing Base Certificates, USAT submitted monthly inventory reports and financial statements. Provident conducted on site "field" audits approximately every six months.

3. Only one Borrowing Base Certificate signed by Mr. Kakde and dated December 16, 2003 was admitted into evidence. Mr. Kakde testified that, due to the absence of Mr. Busch, he signed it, but did not read it before doing so. Mr. Kakde was also aware that Mr. Busch was reluctant to sign Borrowing Base Certifi-

cates once the bankruptcy filing became a certainty.

4. Some funding also came from Infoglobe, an information technology consulting company primarily owned by Mr. Kakde. Infoglobe provided some services to USAT and also transferred to USAT the proceeds of a Small Business Administration loan Infoglobe had received. The amount of funds loaned to USAT by Infoglobe is unknown and USAT did make some repayment on the loan.

5. "Out of formula" refers to a situation in which USAT had already received Loan advances exceeding the limit established by the Borrowing Base formula.

tember 11, 2001, but the company's ultimate demise was precipitated by its diversification into the automotive industry. USAT had been induced by Delphi Automotive Systems, LLC ("Delphi") to invest considerable resources, including funds contributed by Mr. Kakde, into a manufacturing relationship by which USAT would manufacture parts for Delphi's affiliates and ultimately for General Motors. Delphi eventually became USAT's primary customer, accounting for up to 60% of its business.[6] Significant contract cancellations by Delphi precipitated a financial crisis for USAT.

Delphi's first major contract cancellation occurred in December of 2002 resulting in a $200,000.00 termination payment to USAT, a circumstance that was promptly reported to Provident and accounted for in routine Borrowing Base Certificates. A more devastating cancellation, affecting a contract referred to as the Saginaw Steering Order ("Saginaw Cancellation"), occurred in June of 2003 and threatened to put USAT out of business altogether. The Saginaw Steering Order had been the cornerstone of what had been anticipated to be a venture producing several million dollars per year in revenue. This cancellation and its concomitant setoff issues were likewise promptly reported to Provident. Mr. Kakde and his staff realistically anticipated recovering more than $2,000,000.00 in termination damages from Delphi for the Saginaw Cancellation. When months of negotiations with Delphi produced no more than a final offer from Delphi of $750,000.00,[7] and ongoing efforts to secure alternative financing were unfruitful,

USAT had only one viable alternative. It filed for chapter 11 bankruptcy relief on December 24, 2003. On December 30, 2003, Provident obtained judgment against Mr. Kakde on his guaranty in the principal sum of $2,030,632.87 plus interest. Provident assigned its interest in the USAT Loan and the judgment against Mr. Kakde to Buckeye on December 16, 2004 and Mr. Kakde filed his personal bankruptcy on April 6, 2005.

Shortly after Delphi notified USAT of the Saginaw Cancellation in June of 2003, Mr. Kakde and USAT began consulting with Thomas Noland, an experienced chapter 11 bankruptcy attorney. Recognizing that, in the absence of a reasonable agreement with Delphi, the Saginaw Cancellation (together with related contract cancellations and setoffs) would likely make it impossible for USAT to survive, Mr. Kakde directed Mr. Noland to prepare all necessary paperwork by July 28, 2003 to enable the company to file for chapter 11 relief. In the context of this financial emergency and imminent bankruptcy filing, Mr. Noland and his staff met with USAT representatives, including Mr. Kakde and Mr. Busch, on July 31, 2003. At this meeting, among other things discussed, Mr. Noland recommended that USAT open a depository account at a bank other than Provident, the existence of which was not to be disclosed to Provident. According to Mr. Noland, the separate account, although clearly a violation of the Loan covenants, was necessary to preserve USAT's ability to effectively file a chapter 11 case in the event Provident, upon being informed of USAT's bankruptcy plans, opt-

---

**6.** Testimony at trial differed as to the exact percentage of "business" attributable to Delphi and it remains unclear whether "business" means sales, net profit, or something else. Mr. Busch, as the CFO of USAT, stated that the percentage of "business" was 60% and his testimony appeared the most authoritative and credible.

**7.** Unbeknownst to USAT and Provident, Delphi was also experiencing financial difficulties and eventually filed its own chapter 11 case in 2005.

ed to freeze all of the company's accounts and contest the company's use of cash collateral. In Mr. Noland's experience, Provident had a propensity for such uncooperative behavior which he described as "draconian." However, Mr. Noland did not advise USAT as to the source of the funds to be deposited in the new account and did not direct anyone to spend the funds or to falsify Borrowing Base Certificates as a means of keeping the account secret.

The new account was promptly opened at Bank One ("Bank One Account"), but its *raison d'être*, the imminent bankruptcy filing, was delayed for several months as Mr. Kakde negotiated with Delphi and continued to seek alternative financing. Funding of the Bank One Account, and shielding it from disclosure, was left to Mr. Busch. Funding was primarily accomplished by simply depositing receivables payments into the Bank One Account rather than forwarding them to the Provident lock box as required by the Loan documents. Nondisclosure was ensured by deliberately failing to report those receipts and instead continuing to show them as outstanding receivables on the Borrowing Base Certificates submitted to Provident. Also deposited into the Bank One Account were USAT's 2002 tax refund in the amount of $43,499.00 and a $200,000.00 payment from Borg Warner in settlement of litigation.

From August until mid-December of 2003, USAT used some funds from the Bank One Account to pay selected accounts payable. It was also Mr. Busch's practice to remit back to Provident from the Bank One Account sufficient funds to cover any reported (but actually collected) receivable that neared the 90-day outstanding date that would render the receivable ineligible with respect to the Borrowing Base. In other words, those collected receivables funds in the Bank One Account that were not used to pay legitimate USAT payables were to a great extent eventually remitted back to Provident. Provident did not learn of the Bank One Account until December 19, 2003 at a meeting with USAT representatives shortly before the bankruptcy filing.

In this adversary proceeding, Buckeye seeks to deny Mr. Kakde's discharge of the balance of the unpaid USAT debt on the Loan which he owes by virtue of his guaranty. The factual basis for this action is Mr. Kakde's role as president and CEO of USAT during the period of August 1, 2003 and December 22, 2003 when USAT submitted inaccurate Borrowing Base Certificates to Provident. As alleged by Buckeye, the inaccuracies fall into three categories: (1) some reported accounts receivable from Delphi were subject to setoff and therefore not "eligible" and some reported payables to Delphi were understated ("Delphi Setoffs"); (2) USAT diverted its 2002 tax refund in the amount of $43,499 into the Bank One Account ("Tax Refund Diversion"); and (3) as explained above, beginning in August of 2003, USAT diverted some eligible receivables into and out of the undisclosed Bank One Account, but continued to report the receivables to Provident as uncollected and unpaid ("Receivables Diversion"). For ease of reference, "Provident" and "Buckeye" will be used interchangeably.

### CONCLUSIONS OF LAW

**A. Applicable Standards for Dischargeability**

 Buckeye seeks to prevent Mr. Kakde from discharging his debt to Buckeye pursuant to 11 U.S.C. § 523(a)(2)(B) and (4). The party seeking to establish an exception to the discharge of a debt must prove the requisite elements by a preponderance of the evidence. *Grogan v. Gar-*

*ner*, 498 U.S. 279, 290–91, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Furthermore, "exceptions to discharge are to be strictly construed against the creditor." *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

## B. 11 U.S.C. § 523(a)(2)(B)

Buckeye asserts that the debt owed by Mr. Kakde to Buckeye pursuant to Mr. Kakde's personal guaranty is nondischargeable under 11 U.S.C. § 523(a)(2)(B) [8] because USAT obtained advances under the Loan guaranteed by Mr. Kakde and/or caused Provident to forbear from accelerating and collecting the Loan by means of the intentional or reckless submission to Provident of false Borrowing Base Certificates.

■ To prove its case under this subsection, Buckeye must establish five elements: (1) a written statement was used; (2) the statement was materially false; (3) the statement concerned the financial condition of Mr. Kakde or an insider of Mr. Kakde; (4) Provident reasonably relied on the false statement; and (5) Mr. Kakde published the statement with an intent to deceive Provident. 11 U.S.C. § 523(a)(2)(B); *Carson v. Chamberlain (In re Chamberlain)*, 330 B.R. 195, 203 (Bankr.S.D.Ohio 2005).

The court will examine each of these elements in light of the facts elicited at trial.

## 1. Use of a Written Statement

■ Neither of the parties disputes in their pleadings or at trial that the Borrowing Base Certificates submitted daily to Provident by USAT constitute statements in writing within the meaning of the statute. However, in his post-trial brief, Mr. Kakde suggests in a footnote that, except for the one he actually signed, the Borrowing Base Certificates may not satisfy this seemingly simple requirement of § 523(a)(2)(B).

In support of his argument, Mr. Kakde cites *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358 (10th Cir.1997). However, *Kaspar* is easily distinguishable. The statement at issue in *Kaspar* was comprised of the debtors' oral statements taken over the phone by a loan representative and incorporated into a computer generated form that was never seen or signed by either debtor. *Id.* at 1359. Based on those facts, the court determined that the transcribed statement was not the sort of "statement in writing" contemplated by the statute. *Id.* at 1361. In the instant case, the Borrowing Base Certificates were prepared, signed, and certified by agents of USAT, the borrower. Whether Mr. Kakde adopted these statements as his own or should otherwise be held responsible for them as the chief executive officer of USAT is debatable, but their status as "written statements" cannot be seriously questioned. Because this argument is without merit, the court finds that Buckeye has demonstrated the first element of 11 U.S.C. § 523(a)(2)(B).

8. Section 523(a)(2)(B), in relevant part, provides as follows:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

### 2. The Statement was Materially False

Section 523(a)(2)(B)(i) requires a determination that the statements be "materially false." Neither Mr. Kakde nor any other witness disputes that USAT overstated the amount of its eligible receivables in the Borrowing Base Certificates. Thus, the falsity of the statements is conceded and it is only the materiality of the falsehood that remains at issue.

A "materially false" financial statement is "one that paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." *Midwest Comm. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr.N.D.Ohio 2007); *Fifth Third Bank v. Collier (In re Collier)*, 231 B.R. 618, 623 (Bankr. N.D.Ohio 1999). Some courts analyze this element by examining whether the lender would have extended credit had he known of the debtor's true financial condition. *See Matter of Bogstad*, 779 F.2d 370, 375 (7th Cir.1985) *and cases cited therein.* Such an analysis is necessarily hypothetical and should not require a determination of actual reliance by the lender because such a determination would seemingly render part of the "reasonable reliance" element superfluous. However, some overlapping analysis may be dictated by the particular facts before the court. *In re Hunt*, 30 B.R. 425, 440 (M.D.Tenn.1983) ("Although there is substantial similarity between such analysis of 'materiality' and the element of 'reasonable reliance' ..., analysis of the creditor's use of the requested information is appropriate in both contexts."); *see also Sharp*, 357 B.R. at 766.

Generally, the reported decisions under § 523(a)(2)(B) address the typical situation in which the debtor submits a financial statement containing inflated assets and/or minimized liabilities to a lender who may or may not have relied upon the statement in making a decision to extend credit commensurate with the financial wherewithal of the debtor. Determining materiality by gauging the magnitude of the discrepancy and the probable effect on extension of credit is a fairly direct process in these standard scenarios.

Application of the standard analysis to the facts of the instant case is not as direct, however. The credit facility for USAT was documented and the credit limit established at $2,500,000 long before any false Borrowing Base Certificates were submitted to Provident. No one has suggested that any aspect of the Loan or Mr. Kakde's guaranty was procured by means of false financial information. The amount advanced on the Loan fluctuated daily in accordance with predetermined formulas based on receivable and inventory levels. Before USAT encountered cash flow difficulties and began defaulting under the Loan covenants, advances were essentially automatic under these formulas subject to the credit limit. Even after the Loan was transferred to the Special Assets Department of Provident, the pattern of routine formula-derived credit advances continued, albeit with *considerably more scrutiny by Provident.*

The language used in some decisions at least suggests that in assessing materiality, the false statement must actually affect the cognitive decision-making process of the lender. *See, e.g., Chamberlain*, 330 B.R. at 203 (false information must affect the creditor's "thought process"); *Collier*, 231 B.R. at 623 (false information must affect the creditor's "decision-making process"). While the literal effect of the false statements on the lender's decision to extent credit will be addressed at some length when the court turns to the

"reasonable reliance" element of § 523(a)(2)(B), the court does not believe actual comprehending reliance is essential to finding materiality. In other words, the fact that Provident may have mindlessly extended additional credit according to the Loan formula in Pavlovian response to the false Borrowing Base Certificates does not make the false statements less material. It is the cause and effect—false statement and resultant credit extension—that is critical to the analysis, not the conscious thought process or volition of the lender. It cannot be doubted that the inflated receivables numbers on the Borrowing Base Certificates had the effect of causing Provident to allow advances commensurate with the inflated numbers.

■ A key and sometimes determinative consideration in evaluating the materiality of a false statement is the "size of the discrepancy." *See, e.g., Sharp,* 357 B.R. at 765–66. In this instance, for each dollar of eligible receivable falsely reported by USAT, Provident automatically extended credit to the extent of $0.85. Given this direct effect on the extension of credit, it is reasonable to regard the discrepancy as substantial.

It must also be remembered that at the time the incorrect Borrowing Base Certificates were issued, USAT was in default of numerous loan covenants and its commercial activity was consequently being closely monitored by Provident. Supplying the lender with false information under such circumstances and triggering near automatic loan advances has the effect of thwarting such oversight, undermining the lender's control of its risk, and causing the advancement of additional funds in a manner contrary to the Loan documents. The materiality of the false statements is enhanced under these circumstances.

Consequently, at the time and under the circumstances that the inaccurate Borrow-ing Base Certificates were issued by USAT, they were materially false.

### 3. The Statement Respects the Debtor's or an Insider's Financial Condition

When the debtor is an individual, the Bankruptcy Code defines an "insider" as, among other things, "a corporation of which the debtor is a director, an officer or person in control." 11 U.S.C. § 101(31)(A)(iv). Mr. Kakde was the chief executive officer, a director, and the majority shareholder of USAT. Therefore, USAT is unquestionably an insider of Mr. Kakde.

■ The more crucial question in this case, however, is whether the Borrowing Base Certificates qualify as statements "respecting ... financial condition" as contemplated by the statute. Neither party addressed this issue at any length, but it cannot be ignored given the recent decision of the Sixth Circuit Bankruptcy Appellate Panel adopting a "strict interpretation" of this statutory phrase. *Prim Capital Corporation v. May (In re May),* 368 B.R. 85, 2007 WL 2052185, at *7 (6th Cir.BAP July 19, 2007) (table decision).

As thoroughly discussed in *May,* in the absence of a statutory definition of the phrase "respecting the debtor's or an insider's financial condition," courts have developed two mutually exclusive interpretive approaches. *Id.,* at *6; *see also Schneiderman v. Bogdanovich (In re Bogdanovich),* 292 F.3d 104, 112–13 (2nd Cir. 2002) (collecting cases). The "strict interpretation" which limits the referenced statements to those "made regarding a debtor's overall net worth, assets and liabilities" has been adopted by the Tenth Circuit and appears to be favored by the Eighth Circuit. *May,* 2007 WL 2052185, at *6; *Cadwell v. Joelson (In re Joelson),*

427 F.3d 700, 714 (10th Cir.2005), *cert. denied,* 547 U.S. 1163, 126 S.Ct. 2321, 164 L.Ed.2d 840 (2006); *Rose v. Lauer (In re Lauer),* 371 F.3d 406, 413–14 (8th Cir. 2004) (failure to disclose prior disposition of collateral purportedly securing payment under written sales contract is not a written statement respecting financial condition). The "broad interpretation" views the statutory language as encompassing "any communication that has a bearing on the debtor's financial position," including those that merely address the status of a single asset or liability. *May,* 2007 WL 2052185, at *6. This approach has been adopted by the Fourth Circuit. *Engler v. Van Steinburg (In re Van Steinburg),* 744 F.2d 1060 (4th Cir.1984).

■■■■ In adopting the strict interpretation, the Sixth Circuit Bankruptcy Appellate Panel in *May* closely followed and incorporated the "exhaustive analysis" of § 523(a)(2)(A) and (B) contained in *Joelson. May,* 2007 WL 2052185, at *6–7. That analysis, which need not be repeated here, is grounded in the text and structure of the Bankruptcy Code, and logically compelled the conclusion in *May* that "a narrow interpretation, defining financial condition as statements that are made regarding a debtor's overall net worth, assets and liabilities, best adheres to the meaning and purpose of the Bankruptcy Code." *Id.,* at *7.

The issue before this court, then, is whether the Borrowing Base Certificates constitute statements regarding USAT's "overall net worth, assets and liabilities," roughly the equivalent of a financial statement. *Id.* The Borrowing Base Certificates are devoted almost exclusively to the daily status of USAT's accounts receivable. They contain information about inventory

levels, but that data was only updated monthly. Other than static references to a tax refund and the CD pledged by BG Dhake, the Borrowing Base Certificates list no other assets such as machinery, equipment, or vehicles. Likewise, none of USAT's substantial liabilities are listed other than the debt to Provident and receivable setoffs.[9] Testimony at trial consistently characterized the Borrowing Base Certificates as collateral reports used by Provident to monitor daily fluctuations in its collateral position and to correspondingly set formula-based limits for advances under the Loan. Indeed, as Mr. Busch testified, to obtain more comprehensive asset and liability information, Provident required USAT to submit unaudited financial statements periodically and audited statements annually. Clearly the Borrowing Base Certificates were not intended for that purpose, nor did they serve that purpose. Consequently, under the "strict interpretation" adopted in *May* and followed by this court, the Borrowing Base Certificates are not statements "respecting the debtor's or an insider's financial condition" and Buckeye has failed to prove this element of § 523(a)(2)(B).

#### 4. The Creditor Reasonably Relied on the Statement

■■■■ To deny the discharge of a debt under § 523(a)(2)(B), the creditor must establish that it "reasonably relied" on the false statement. Generally, courts have held that "reasonable reliance" is a question of fact to be determined in light of the totality of the circumstances. *In re Ledford,* 970 F.2d 1556, 1560 (6th Cir. 1992); *In re Woolum,* 979 F.2d 71, 75–76 (6th Cir.1992); *Matter of Coston,* 991 F.2d 257, 261 (5th Cir.1993). In effect, the

---

**9.** USAT's original bankruptcy schedules indicate personal property valued at $7,244,650.33. Scheduled liabilities included

secured claims of $3,730,506.36, priority unsecured claims of $435,392.51, and unsecured nonpriority claims of $2,481,523.85.

court must first determine that the creditor actually relied on the false statement in extending the loan and then that the reliance was objectively reasonable. *National City Bank v. Plechaty (In re Plechaty)*, 213 B.R. 119, 126–27 (6th Cir. BAP 1997); *John Deere Co. v. Myers (In re Myers)*, 124 B.R. 735, 742–43 (Bankr.S.D.Ohio 1991); *I.H. Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 809 (Bankr.E.D.Va.1993). In the Sixth Circuit, however, the "reasonableness" requirement is not a rigorous one, "but rather is directed at creditors acting in bad faith." *Woolum*, 979 F.2d at 76 (quoting *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir.1985)). The creditor must only establish "its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact." *Woolum*, 979 F.2d at 76 (quoting *Matter of Garman*, 643 F.2d 1252, 1258 (7th Cir. 1980)). Furthermore, in assessing the reasonableness of the reliance, the court should refrain from a subjective evaluation of the creditor's lending policy and practices and should not base its decision on whether the court, in the creditor's place, would have extended the loan. *Ledford*, 970 F.2d at 1560; *Woolum*, 979 F.2d at 76.

■ In addressing reliance in this case, an important distinction must be made, although it was largely ignored during the trial. That distinction is between Provident's reliance on the Borrowing Base Certificates to monitor and automatically allow advances under the Loan on the one hand and Provident's alleged reliance for purposes of continuing or renewing the lending relationship on the other. The distinction is not only critical in evaluating Provident's reliance, but it also pertains to the issue of damages and proximate causation that were addressed during closing argument and in the parties' post-trial briefs.

To the extent that Provident allowed Loan advances to USAT in accordance with the Borrowing Base formula and in amounts commensurate with the representations contained in the falsified Borrowing Base Certificates, the court is persuaded that Provident relied on the false representations. As previously discussed with respect to "materiality," this process appears to have been more automatic than consciously decisional, but the cause and effect are quite clear. Reliance under these circumstances was essentially institutionalized by virtue of a formula and a routine reporting system. USAT expected Provident to reliably advance funds in accordance with the collateral level USAT reported and Provident recognized its obligation to meet that expectation and therefore relied on the information contained in the Borrowing Base Certificates when allowing the advances.

Given this institutionalized and routinized form of reliance, it is easy to conclude that the reliance was reasonable within the meaning of the statute. This was an asset-based loan with an established procedure for regular collateral reporting and correlative loan advances. The procedures, terms, and consequences were fully understood and implemented by both parties. As noted earlier, these procedures and bank policies are not for this court to question in the abstract. *Ledford*, 970 F.2d at 1560. In this case, the court can perceive no bad faith on the part of Provident in relying on a reporting system that USAT fully understood would induce Provident to make near-instantaneous advances under the Loan. Such reliance on a mutually agreed upon and understood system intended to administer an asset-based commercial loan is inherently reasonable. Therefore, assuming that Buckeye could

establish the other requisite elements under § 523(a)(2)(B), the amount of Loan advances attributable to the false Borrowing Base Certificates would be nondischargeable.

However, Provident's claimed reliance on the Borrowing Base Certificates and the reasonableness of that reliance do not hold true with respect to Provident's assessment of whether to continue or renew its lending relationship with USAT. In other words, upon review of the totality of the circumstances, the court is not persuaded that Provident relied upon the Borrowing Base Certificates in making its decision to forebear from accelerating and demanding immediate payment of the Loan. Much of the testimony at trial was directed to this issue and Buckeye, to demonstrate its reliance, maintains that had Provident known the true status of the receivables and been aware of USAT's duplicity, it may well have ceased all advances and accelerated the Loan.

First of all, while it seems likely that knowledge of USAT's duplicity would have affected Provident's behavior, that supposition is not relevant to this analysis. The issue is whether Provident relied on the false statements, not whether Provident relied upon USAT's or Mr. Kakde's honesty. Put another way, in proving its reliance, Buckeye must show that, rather than forebear, it likely would have decided to terminate the lending relationship or accelerate the Loan had USAT been honest and provided accurate Borrowing Base Certificates; it is simply not germane that Provident might have reacted negatively to the borrower's dishonesty.

Neither do the uncontroverted facts support the balance of Buckeye's argument in this regard. The picture that emerges from the testimony at trial is one in which Provident felt reasonably comfortable with its collateral base, the financial controls it had in place, and the additional pledges and assurances received from Mr. Kakde. Provident was cautiously proceeding with the lending relationship with the belief that full payment on the Loan debt was more likely if USAT stayed in business. Mr. Burk, the Vice President at Provident's Special Asset Division who was in charge of the Loan, admitted that he knew USAT needed the Loan in order to stay in business and that Provident's chances of recovery were far better if USAT remained in business. This overarching concern is also evident from Provident's continued tolerance of overdrafts and its payment of specific checks despite USAT's longstanding defaults and current "out-of-formula" status.

Indeed, given the magnitude of the defaults and general deterioration of USAT's financial condition, the Borrowing Base Certificate discrepancies seem insignificant and Provident's receipt of accurate daily receivables information is unlikely to have deterred Provident from its course of cautious lending. When the Loan was transferred to Mr. Burk's department in May 2002, USAT was already in default under all of its various financial covenants, yet Provident did not exercise its default rights and it waived the covenant violations for fiscal years 2001 and 2002. When in November 2002, a field audit discovered discrepancies between the Borrowing Base Certificates and the actual collateral (both the accounts receivable and inventory were out-of-formula), Provident took no remedial action. Provident was also well aware that USAT had close to one million dollars in arrearages relative to its accounts payable and the bank's auditors had expressed concerns over USAT's "customer concentration problem" whereby USAT's top ten customers accounted for 99% of its accounts receivable with Delphi representing 60%. On various occasions, Provident

evaluated several scenarios to determine what it could realize on its collateral in the event it were forced to sell it.

Notwithstanding this troublesome financial situation, Provident allowed overdrafts and paid checks. In fact, Provident continued extending credit to USAT until it learned of the bankruptcy filing. Mr. Burk testified that, as of December 12, 2003, despite the mounting financial struggles USAT faced, Provident had made the decision to renew the Loan and that, but for the bankruptcy filing, Provident would have done so. These circumstances strongly suggest that only dramatic negative events or severe collateral dissipation would have affected Provident's pattern of conduct, and certainly not the daily receivable variations reported in the Borrowing Base Certificates. They also suggest that it would not have been reasonable for Provident to rely on routine collateral reports in making its ultimate lending decision. *See First National Bank of Boston v. Mann (In re Mann)*, 40 B.R. 496, 499–500 (Bankr.D.Mass.1984) (bank's claimed reasonable reliance not credible where bank continued to lend with knowledge that it had over-advanced).

Provident had recourse to more significant reports and was clearly influenced by other circumstances in charting its lending course with USAT. Testimony and documentary evidence indicate that Provident gave great weight to cash flow projections provided by USAT in early 2002, forecasting a return to profitability of the company by mid-year. In addition, Provident's conduct was manifestly affected by Mr. Kakde's net worth as a guarantor, his infusion of capital into the company, his provision of substantial additional collateral in the form of certificates of deposit from his friend Mr. Dhake, his ceaseless efforts to obtain alternative financing, and his unwavering willingness to cooperate with Provident. Provident also assumed that USAT's primary customer, Delphi, was creditworthy and that the Delphi receivables were therefore collectable. Provident's own audit teams periodically assessed the USAT collateral and its liquidation value and provided reports sufficiently reassuring to allow Provident to continue the lending relationship.

The Borrowing Base Certificates were simply relied upon as a gauge to monitor and control short-term Loan advances and were never regarded by Provident as critical to its overall decision to continue or terminate the lending relationship. Mr. Burk attested to Provident's reliance on the Borrowing Base Certificates for allowing formula-based advances in the routine manner already discussed, but he never specifically nor categorically stated that the Borrowing Base Certificates affected his or his supervisor's decision-making process with respect to continuing or terminating the Loan. In fact, Mr. Burk testified that he did not look at the actual Borrowing Base Certificates, but only glanced at the "automatic generated funds statements," those daily summaries of the Borrowing Base Certificates generated by Provident internally. Also, Provident's practice of discarding the Borrowing Base Certificates instead of retaining them as part of its loan record is consistent with ephemeral collateral monitoring rather than serious loan review. *First National Bank of Olathe, Kansas v. Pontow*, 111 F.3d 604, 609–10 (8th Cir.1997) (bank's discarding borrowing base certificates "strongly suggests" it did not rely on them).

As previously stated, with respect to the reliance element of § 523(a)(2)(B), Buckeye has shown reasonable reliance for that correlative portion of advances made by Provident in response to the false information on the Borrowing Base Certificates,

an amount presumably less than the entire unpaid Loan balance. However, it has failed to persuade this court that Provident actually relied on the Borrowing Base Certificates in making its decision to forbear or any other decisions pertaining to the Loan as a whole, a prerequisite to finding the entire Loan balance debt nondischargeable as to Mr. Kakde.

In addressing the related issues of damages and causation at trial, Buckeye adamantly maintained that the entire Loan balance was nondischargeable and refused to quantify the lesser amount attributable to the Loan advances induced by the false Borrowing Base Certificates (although it did attempt to do so in its post-trial brief).[10] Buckeye's unwillingness to distinguish between the entire unpaid Loan balance and the lesser amount of the advances is based on its "all or nothing" interpretation of the statute. It is true that the majority of courts, including the Sixth Circuit Court of Appeals, have interpreted the section in this "all or nothing" manner, refusing to read into the statute a requirement to prove causation or damages. *Wolf v. Campbell (In re Campbell),* 159 F.3d 963, 966–67 (6th Cir.1998); *Plechaty,* 213 B.R. at 128; *In re McFarland,* 84 F.3d 943, 947 (7th Cir.1996); *Matter of Norris,* 70 F.3d 27, 29 n. 6 (5th Cir.1995); *In re Goodrich,* 999 F.2d 22, 25 (1st Cir. 1993); *John Deere Co. v. Gerlach (In re Gerlach),* 897 F.2d 1048, 1051 (10th Cir. 1990).

In joining the majority of courts on this issue, the Sixth Circuit in *Campbell* merely relied on the plain meaning of the statute which patently does not contain any reference to proximate causation or damages. *Campbell,* 159 F.3d at 966–67. But, the *Campbell* court further emphasized that "the phrase 'to the extent obtained by' only exempts from discharge *the amounts actually extended as a result of the false statement."* *Campbell,* 159 F.3d at 967 (emphasis added). This requirement was satisfied to the full extent of the debt in *Campbell* because the creditors in that case were induced by the false information to forebear from demanding immediate payment of the full amount. *Id.*

In each of the above-cited appellate decisions except for *Gerlach,* the facts likewise dictated nondischargeability of the entire debt in that the debtor's false statements effected an extension, renewal, refinancing, or forbearance with respect to the entire debt. *Plechaty,* 213 B.R. at 125–26 (forbearance was equivalent to extension of credit to full extent of note amount); *McFarland,* 84 F.3d at 947 (refinancing of existing debt plus extension of new credit held nondischargeable); *Norris,* 70 F.3d at 29–30 (renewal of entire note renders entire amount nondischargeable despite no advancement of new money); *Goodrich,* 999 F.2d at 27 (bank reliance on false statement in renewing entire loan that would otherwise have been due resulted in nondischargeability of existing credit and new advances).

**10.** Buckeye did not established at trial the extent to which Provident was harmed as a result of its alleged reliance on the Borrowing Base Certificates. In fact, Buckeye's own expert testified that not only did he not analyze the damages Provident may have suffered but that Provident may not have suffered any damages at all. Conversely, Ms. Roberts, Mr. Kakde's expert, convincingly explained that the depositing of some receivables in the Bank One Account had a negligible impact on

Provident. The audit that Provident conducted after USAT filed for bankruptcy provides support for Ms. Robert's conclusion in that it found that as of February 2004, Provident was an over-secured creditor. According to Mr. Noland's testimony, because of its status as an over-secured creditor, Provident received over a million dollars in interest payments during USAT's bankruptcy case. The record is devoid of any proof of damages suffered by Provident.

In *Gerlach,* somewhat similar to this case, the court was faced with a series of false statements in the form of sham sales contracts which induced the creditor to forebear as well as extend additional unsecured credit. Rather than hold the entire guaranteed debt nondischargeable, the court remanded the case for a determination of the amount of the defendant's guaranty debt that was obtained by means of the sham contracts. *Gerlach,* 897 F.2d at 1052. Consequently, this court's determination that Provident only relied on the false Borrowing Base Certificates to the extent of formula-based advances derived from the false information they contained, is entirely consistent with the statutory language and with Sixth Circuit precedent.

As noted previously, Buckeye was unwilling at trial to quantify Provident's reliance on the false information in the Borrowing Base Certificates and how the information translated into a correlative increase in funds advanced to USAT. The court is constricted by this lack of adequate evidence of reasonable reliance and, therefore, concludes that this element of Buckeye's § 523(a)(2)(B) claim is not met.

### 5. The Debtor Intended to Deceive the Creditor

The fifth and final element of a § 523(a)(2)(B) claim is the debtor's intent to deceive the creditor. To meet the intent requirement, Buckeye must demonstrate that Mr. Kakde intended to deceive Provident by means of the false information contained in the Borrowing Base Certificates. Whether Mr. Kakde had such an intent is an exceedingly close question and, given the court's negative determination as to several other elements, it is a question that need not be answered. Nevertheless, addressing the issue may help the parties more fully understand the factors that have influenced the court's decision. On the one hand, there is a strong logical supposition that Mr. Kakde must have known about the ongoing submission of false Borrowing Base Certificates to Provident. On the other hand, there is no direct evidence of such knowledge, there are factors that make his ignorance and lack of intent plausible, and there was compelling and credible testimony at trial denying such an intent. Ultimately, the court cannot with any assurance conclude that Mr. Kakde did or did not have the requisite intent to deceive, a decisional stalemate that favors Mr. Kakde, the debtor.

In the Sixth Circuit, the standard for determining intent includes actual intent to deceive as well as gross recklessness. *Martin v. Bank of Germantown (In re Martin),* 761 F.2d 1163, 1167 (6th Cir. 1985); *Myers,* 124 B.R. at 741 (requires proof that "statement was either knowingly false or made so recklessly as to warrant a finding that the Debtor acted fraudulently"). A determination of intent to deceive focuses on circumstantial evidence and is generally "inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive or cheat the creditor." *Myers,* 124 B.R. at 741. If there is room for an inference of honest intent, the question of nondischargeability must be resolved in the debtor's favor. *Collier,* 231 B.R. at 626 (citing *Van Wert Nat'l Bank v. Druckemiller (In re Druckemiller),* 177 B.R. 859, 861 (Bankr. N.D.Ohio 1994)).

Buckeye's preliminary hurdle with respect to proving intent is to hold Mr. Kakde responsible for Borrowing Base Certificates prepared, signed, and submitted by others. With the exception of one certificate that he signed without reading, there is no evidence that Mr. Kakde had

any involvement whatsoever with the Borrowing Base Certificates. It is undisputed that Mr. Busch had primary responsibility for generating and signing them. Buckeye argues that because Mr. Kakde was a sophisticated business man and the CEO to whom Mr. Busch and others reported, he must be held responsible for the intentional or reckless submission of the false information presented to Provident.

In its post-trial brief, Buckeye argues that the liability of a non-debtor can be imputed to a debtor under § 523(a)(2)(B). As authority for this proposition, Buckeye cites *Ledford,* 970 F.2d at 1561–62. However, in addition to the distinguishing fact that it deals with § 523(a)(2)(A) rather § 523(a)(2)(B), *Ledford* addresses imputed liability in the context of partnership law,[11] not corporate law. *See id.* at 1561. *Ledford* in turn relies on a Fifth Circuit case, *Luce v. First Equipment Leasing Corp. (In re Luce),* 960 F.2d 1277 (5th Cir.1992) (*per curiam*) in which partnership law was also pivotal. Significantly, when faced with a similar situation in the corporate context, the Fifth Circuit refused to impute fraud among corporate shareholders for § 523(a)(2)(A) purposes without evidence that: (i) the perpetrator was the *alter ego* of the corporation; (ii) the perpetrator participated in the fraud; or (iii) the other shareholders and executives acted as the perpetrator's agents. *See Recover-Edge L.P. v. Pentecost (In re Carpenter),* 44 F.3d 1284, 1296 (5th Cir.1995); *see also*

*Barclays American/Business Credit v. Long (In re Long),* 774 F.2d 875, 878 (8th Cir.1985) (refusing to apply general agency law principles to impose liability on an innocent corporate shareholder). In short, the somewhat automatic statutory imputation of liability under partnership law does not pertain in the corporate context. Proof of an agency relationship or direct involvement in the misrepresentation is required.[12]

Consequently, it is necessary to review the facts closely to determine whether Mr. Kakde's personal knowledge or direct involvement in the subterfuge was sufficient to constitute intentional deceit or reckless disregard for the truth. In conducting that review, it is helpful to distinguish between the types of inaccuracies contained in the Borrowing Base Certificates. As previously noted, Buckeye alleges that the inaccuracies fall into three categories: (1) the Delphi Setoffs; (2) the Tax Refund Diversion; and (3) the Receivables Diversion.

### a. The Delphi Setoffs

It is especially clear that USAT's reporting with regard to the Delphi Setoffs was not intended to deceive Provident. According to the uncontroverted trial testimony of Mr. Kakde and Mr. Busch, any supposed inaccuracies pertaining to the Delphi Setoffs were attributable to the complicated reciprocal supply arrange-

---

**11.** Under Ohio law, a partner is liable for the misconduct of another partner acting within the scope of the partnership. *See* Ohio Rev. Code. § 1775, *et seq.; see also* 59A Am.Jur.2d *Partnership* § 429 (2007).

**12.** With respect to the single Borrowing Base Certificate actually signed by Mr. Kakde, Buckeye may well have established sufficient direct involvement to hold Mr. Kakde accountable for recklessness, if not actual intent, even though he did not actually read the document he signed. *See, e.g., David v. An-*

*napolis Banking & Trust Co.,* 209 F.2d 343, 344 (4th Cir.1953) (failure to read financial statement before signing does not excuse reckless indifference to the facts). However, credible testimony at trial revealed that Provident advanced no additional funds in reliance on this particular Borrowing Base Certificate issued a few days before USAT filed its bankruptcy case. Consequently, a more in depth analysis focusing solely on this single document is unwarranted.

ments between USAT and Delphi, Delphi's assumption of USAT debts to suppliers, and/or the anomalous setoffs that resulted from settlement of two partial contract cancellations by Delphi. Mr. Busch testified that the accounting practices employed by USAT with respect to the Delphi Setoffs were contemporaneously disclosed to agents of Provident during routine audits and subsequently approved by those agents. Further, he indicated that it was not until Provident conducted a post-bankruptcy audit that such accounting practices became an issue. Because this court finds that Provident knew and approved of what Buckeye now alleges were fraudulent accounting practices designed to deceive Provident, it cannot find that either Mr. Kakde or Mr. Busch had any intent to deceive or that their actions were reckless in connection with the Delphi Setoffs.

### b. The Tax Refund Diversion

Mr. Kakde denied any knowledge of the Tax Refund Diversion. Neither Mr. Busch nor Mr. Burk provided definitive testimony regarding it. Mr. Busch seemed to recall that the tax refund was not included in the final borrowing base number used by Provident to determine availability. Conversely, Mr. Burk declared that he felt that Mr. Busch had lied to him about the tax refund. While not conclusive, the testimony at least suggests a good faith misunderstanding on the part of Mr. Busch rather than any intentional deceit. As noted earlier, Mr. Busch was a particularly credible witness, in part because he admitted sole responsibility and

blame for initiating and continuing the procedure of falsifying Borrowing Base Certificates, most of which he certified. Mr. Burk, on the other hand, was far less credible and frequently seemed to have a selective memory. Regardless of witness credibility, there was no specific testimony or other evidence ascribing to Mr. Kakde any knowledge or involvement in the Tax Refund Diversion.

Nevertheless, to the extent that this issue remains ambiguous, and because it would not be unreasonable for Provident to regard a tax refund as part of its collateral, the tax refund will also be considered as one of the Diverted Receivables in the following section.

### c. The Receivables Diversion

The record contains conflicting evidence as to whether Mr. Kakde knew or should have known of the Diverted Receivables as erroneously reported in the Borrowing Base Certificates.[13] Mr. Kakde testified that he was unaware of any inaccuracies in the Borrowing Base Certificates, that he justifiably and completely relied on Mr. Busch, and that he insisted upon appropriate professional behavior by Mr. Busch and other staff members. Mr. Busch's testimony, and, to some extent, that of Mr. Burk[14] and Mr. Noland, substantiate Mr. Kakde's testimony. While it is clear that Mr. Kakde did not instruct Mr. Busch to falsify the Borrowing Base Certificates, it is less clear that, after the initial decision to seek bankruptcy protection had been made, Mr. Kakde had a right to continue

13. As noted above, because the tax refund may be viewed as a type of receivable and because this court cannot draw definitive conclusions from the parties' testimony in connection with it, the tax refund will be lumped with the Diverted Receivables for discussion purposes.

14. Mr. Burk admitted at trial that he never talked about the Borrowing Base Certificates with Mr. Kakde.

his customary reliance upon his CFO to prepare accurate certificates.

Mr. Busch's testimony suggests that although there was no direct communication between Mr. Kakde and Mr. Busch regarding the incorrect content of the Borrowing Base Certificates, Mr. Kakde logically had to be aware of the subterfuge because it was the only way to keep the Bank One Account secret from Provident. Furthermore, it would seem that Mr. Kakde should have realized something was amiss when Mr. Busch expressed his reluctance to sign the Borrowing Base Certificates. Finally, given Mr. Kakde's education, business acumen, and experience with financial institutions, it is hard to believe that Mr. Kakde would not have understood the implications stemming from the opening of the Bank One Account.

However, these suppositions are not determinative and the underlying facts must be viewed in context. Mr. Kakde and Mr. Busch, in this court's view, are essentially honest men who had no intention of cheating Provident or enriching themselves. It is true that they stood to benefit indirectly by maintaining the business as a going concern, but that is an essential duty of any corporate officer. To preserve USAT's ability to file a chapter 11 reorganization, and acting under advice of trusted corporate counsel, they opened the Bank One Account and funded it, at least in part, with receivables that were Provident's collateral. Although they did not intend to deprive Provident of its collateral and took steps to minimize any adverse effect on Provident, it is unquestionably true that they both intended to avoid disclosure of the Bank One Account.

Mr. Kakde testified repeatedly and convincingly that he never intended to deceive or harm Provident or to obtain more funds than USAT would otherwise have been eligible to receive. He further testified that he was "shocked" to learn that the Borrowing Base Certificates had been falsified by Mr. Busch. As noted, it is somewhat difficult to believe that a sophisticated businessman such as Mr. Kakde, who was aware of the diversion of receivables into a secret bank account, was oblivious as to the means by which nondisclosure of the account would be perpetuated. But there are facts and circumstances that support his testimony.

First of all, the stratagem of opening the Bank One Account and collecting some funds in it, as originally envisioned, was to be of short duration to accomplish a bankruptcy filing in perhaps two weeks. It is not unreasonable to suppose that under these circumstances Mr. Kakde would not have contemplated a prolonged series of false Borrowing Base Certificates or any other devious activity. Mr. Kakde had much more important matters to attend to and, understandably, deferred the details of this relatively minor short-term issue to his CFO, Mr. Busch, in whom he had complete confidence. Other than the general management of his business during this time of crisis, Mr. Kakde was primarily focused on three highly critical objectives: 1) maintaining shipments from unpaid suppliers; 2) negotiating a favorable settlement with Delphi over the Saginaw Cancellation; and 3) obtaining alternative financing for USAT. According to his testimony, from the time of the opening of the Bank One Account in August of 2003 until USAT's chapter 11 bankruptcy filing in December of that year, Mr. Kakde was away from his office two-thirds of the time, traveling to various parts of the country striving to achieve these objectives. The "imminent" bankruptcy filing was delayed by several months as these vital negotiations continued. It is not implausible to imagine that during that time Mr. Kakde

was so intensely preoccupied with these efforts to save USAT and avoid bankruptcy that he did not contemplate the specific means by which Mr. Busch was hiding the Bank One Account from Provident or accounting for receivables.

It is also worth noting that, throughout the lending relationship, Mr. Kakde's conduct toward Provident was professional, ethical, and proactively cooperative. Everything that Provident asked for, it received. Provident requested that Mr. Kakde subordinate his capital contribution in USAT and he did so. Provident requested additional collateral and Mr. Kakde liquidated his retirement account and contributed the funds to working capital. Provident requested yet more collateral and Mr. Kakde induced a close friend to pledge $455,000. Provident requested the intervention of outside management and workout consultants and Mr. Kakde acquiesced while working diligently to find alternative financing to pay off Provident. Despite Buckeye's arguments to the contrary, the record is devoid of any evidence that funds from the Bank One Account were used for Mr. Kakde's personal benefit or to pay any creditor outside the ordinary course of business. This pattern of behavior is not consistent with an intent to deceive or a reckless disregard for the truth.

Having considered all of the facts and circumstances and bearing in mind the essential bankruptcy policy favoring a "fresh start" for the "honest but unfortunate debtor," it is not clear that Mr. Kakde acted with the requisite intent to deceive or with the degree of recklessness as to which the court can infer such an intent. *Grogan,* 498 U.S. 279, at 286–87, 111 S.Ct.

654, 112 L.Ed.2d 755; *see also Marrama v. Citizens Bank of Massachusetts,* —— U.S. ——, 127 S.Ct. 1105, 1111, 166 L.Ed.2d 956 (2007) (bankruptcy laws were enacted to protect "honest but unfortunate" debtors); *In re Cohn,* 54 F.3d 1108, 1120 (3d Cir.1995) (noting that standards for evaluating "intent to deceive" are to strike a balance between a creditor's difficult burden of proof and the underlying purpose of bankruptcy law to provide a "fresh start"); *In re Carter,* 11 B.R. 992, 998 (Bankr.M.D.Tenn.1981) (Congress intended § 523(a)(2)(B) as a "punitive sanction to be imposed upon dishonest debtors").

As noted previously, where the facts do not compel a particular result and there is room for an inference of honesty on the part of the debtor, the court must adopt the inference favoring the debtor. *Collier,* 231 B.R. at 626. Therefore, while recognizing this element as a close call, the court concludes that Buckeye has not demonstrated Mr. Kakde's intent to deceive Provident with the false information in the Borrowing Base Certificates. For all the reasons set forth above, Buckeye has failed to establish, by a preponderance of the evidence, that Mr. Kakde's guaranty debt is excepted from discharge pursuant to § 523(a)(2)(B).

**C. 11 U.S.C. § 523(a)(4)**

■ Buckeye brings a separate claim pursuant to § 523(a)(4), a Bankruptcy Code section excepting from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity ...." 11 U.S.C. § 523(a)(4).[15] According to Buckeye's Complaint, closing argument, and post-trial brief, Mr. Kakde breached his fiduciary

---

15. Buckeye does not argue that Mr. Kakde committed embezzlement or larceny, the other misdeeds referenced in this statutory section but not qualified by the words "while acting in a fiduciary capacity." Furthermore, there was no credible evidence at trial that Mr. Kakde unlawfully misappropriated Provident's or Buckeye's property.

duty to either Provident, USAT, or USAT's creditors by supplying information to Provident that he knew to be false and misleading and upon which Provident reasonably relied. Alternatively, Buckeye asserts that Mr. Kakde breached his duty by failing to exercise reasonable care or competence in obtaining, determining or communicating information which was materially false or misleading at the time it was made. However, as made clear from the language of § 523(a)(4), the premise of a nondischargeability claim for fraud or defalcation under this Bankruptcy Code provision is that the debtor acted in a fiduciary capacity. In this case, Buckeye lacks standing to bring a claim based on Mr. Kakde's fiduciary duty to his own corporation, USAT. Furthermore, Mr. Kakde owes no fiduciary duty to USAT's creditors or to Provident/Buckeye upon which a § 523(a)(4) claim could be based. As such, Buckeye's § 523(a)(4) claim fails.

■ In its Complaint, Buckeye initially alleges that Mr. Kakde, as chief executive officer and director of USAT owed a fiduciary duty to USAT's creditors. Buckeye's theory is untenable. This court has previously determined that under Ohio Revised Code § 1701.59(E), corporate officers and directors, while owing fiduciary obligations to the corporation and its shareholders, have no comparable legal obligation to creditors even when the corporation becomes insolvent. *Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Industrial Corporation)*, 365 B.R. 91, 110 (Bankr.S.D.Ohio.2007).

■ In its post-trial brief, Buckeye altered its § 523(a)(4) argument, alleging that Mr. Kakde breached his fiduciary duty to USAT, the corporation, rather than to creditors. However, Buckeye's argument still misses the mark. It is a well established principle that actions for breach of fiduciary duties on the part of corporate officers or directors are to be brought by the corporation or by way of a derivative action because the cause of action is owned by the corporation itself. *See Bash v. Sun Trust Banks, Inc. (In re Ohio Business Machines, Inc.)*, 356 B.R. 786, 2007 WL 177941, at *7 (6th Cir.BAP Jan.25, 2007) (table decision); *see also Ohio Bureau of Workers' Compensation v. MDL Active Duration Fund, Ltd.*, 476 F.Supp.2d 809, 822 (S.D.Ohio 2007); *Carlson v. Rabkin*, 152 Ohio App.3d 672, 789 N.E.2d 1122, 1127 (2003). Therefore, Buckeye lacks standing to assert a claim based on breach of fiduciary duty to the corporation.

■ Finally, although not entirely clear from Buckeye's post-trial brief, it appears that Buckeye alleges a breach of fiduciary duty based on Mr. Kakde's direct relationship with Provident by way of his guaranty. However, no fiduciary relationship is established by a debtor who merely guarantees a corporation's debt. *See Board of Trustees of the Ohio Carpenters Pension Fund on Behalf of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639–40 (6th Cir.2007) (suggesting that a contractual obligation to pay a debt, without more, does not establish a trust or fiduciary relationship); *Securamerica Business Credit v. White (In re White)*, 2003 WL 22871586, at *6 (Bankr. W.D.Tenn. Oct.28, 2003) (noting that the mere guarantee of a corporate debt fails to establish a fiduciary relationship).

Without evidence that Mr. Kakde acted in a fiduciary capacity, Buckeye's § 523(a)(4) claim is without merit.

In conclusion, Buckeye has failed to establish the nondischargeability of Mr. Kakde's guaranty debt to Buckeye pursuant to either 11 U.S.C. § 523(a)(2)(B) or

§ 523(a)(4). Accordingly, the debt is hereby discharged.

**IT IS SO ORDERED.**